715 A.2d 967

PETER LEWIS, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. AMERICAN CYANAMID COMPANY, REALEX CHEMICAL CORPORATION, CHEMSICO INCORPORATED, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS, AND DOES I THROUGH V, FICTITIOUS DESIGNATIONS, DEFENDANTS.

Argued February 17, 1998—Decided July 20, 1998.

548

*Dudley W. Von Holt,* a member of the Missouri bar, argued the cause for appellant and cross-respondent United Industries Corporation appearing in place of Realex Chemical Corporation and Chemsico Incorporated in this action (*Piper & Marbury,* attorneys; *Robert J. Assuncao,* of counsel; *Mr. Assuncao* and *Steven F. Gooby,* on the briefs).

*Anthony J. Marchetta,* argued the cause for appellant and cross-respondent American Cyanamid Company (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Marchetta, Kathryn M. Decker, Suzanne M. Sofer* and *Ronald D. Coleman,* on the briefs).

*James M. Burke,* argued the cause for respondent and cross-appellant (*Mackevich, Burke & Stanicki,* attorneys).

POLLOCK, J.

Plaintiff, Peter Lewis, was burned in an explosion that occurred while he was using two Combat Room Foggers manufactured by co-defendant United Industries Corp. (United) and sold by co-defendant American Cyanamid Co. (American). He brought failure-to-warn, manufacturing-defect, and design-defect claims against both defendants. The Law Division dismissed plaintiff's failure-to-warn claim, holding it was preempted by the Federal

Insecticide, Fungicide and Rodentia Act ("FIFRA"). 7 *U.S.C.* §§ 136–136y. A jury rejected plaintiff's manufacturing-defect claim, but awarded him damages on his design-defect claim.

The Law Division granted defendants' motion for judgment notwithstanding the verdict. *R.* 4:40–2. The Appellate Division reversed and remanded on the issues of plaintiff's comparative negligence and damages, but not on defendants' liability. 294 *N.J.Super.* 53, 81, 682 *A.*2d 724 (App.Div.1996). It affirmed the dismissal of plaintiff's failure-to-warn claim. *Id.* at 67, 682 *A.*2d 724.

We granted defendants' petitions and plaintiff's cross-petition for certification. 151 *N.J.* 74, 697 *A.*2d 546 (1997). We affirm the Appellate Division's decision to dismiss plaintiff's failure-to-warn claim and to reverse the entry of judgment notwithstanding the verdict. We modify the Appellate Division's judgment by remanding for a retrial on the issues of plaintiff's comparative fault and defendants' liability, but not on the issue of damages. We also hold that plaintiff introduced sufficient facts to justify submission to the jury of the proposed alternative design of the propellant.

## I.

On July 4, 1989, plaintiff was burned in an explosion arising from his use of two foggers. Plaintiff had purchased a "three-pack" of the foggers after reading their instructions and labels. On the day of the accident, he used two of the foggers in his kitchen. He vigorously shook the foggers and blew out the pilot light on his stove. Then he activated one fogger in a cabinet under his sink and another fogger under his stove. He activated the foggers by depressing a lever on the top of the canister that held the insecticide and propellant. On activation, the foggers began spraying their contents upward. The foggers were designed so that once activated they would continue spraying until the canister was empty. After activating the foggers, plaintiff left the kitchen.

Approximately one minute later, plaintiff checked on the foggers. The fogger under the stove appeared to be malfunctioning.

It was leaking liquid down its side and producing a weak spray. Contrary to the instructions on the foggers' label, plaintiff reentered the kitchen. He held his breath to avoid inhaling any of the spray, knelt on the ground, and attempted to grab the malfunctioning fogger to depress the actuator a second time. As plaintiff unsuccessfully tried to grasp the fogger, he turned his head and saw a fireball racing toward him.

Plaintiff suffered second degree burns over twenty-five percent of his body. By the date of the trial, he had made a good recovery and had returned to his job as a lab technician and a waiter. His burns resulted in skin damage, including permanent scars.

In his complaint, plaintiff alleged that the foggers' warning concerning flammability was inadequate, that the leaking fogger suffered from a manufacturing defect, and that the flammability of the foggers' contents resulted from a design defect. Before trial, the Law Division dismissed plaintiff's failure-to-warn claim, holding it to be preempted by FIFRA. Plaintiff proceeded to trial on his design- and manufacturing-defect claims.

The foggers used a hydrocarbon propellant. At trial, plaintiff asserted that the foggers should have been designed to use the compound P–22, instead of a hydrocarbon propellant. Both plaintiff and defendants offered expert testimony regarding the practicality and feasibility of P–22 as an alternative design. Plaintiff's expert testified that P–22 was safe for use in the foggers and was three times less flammable than the hydrocarbon propellant. He noted that other foggers marketed at the time of plaintiff's accident used P–22 as a propellant. In contrast, defendant's expert testified that P–22 was a teratogen, meaning it could cause birth defects. He explained further that P–22 eventually was phased out by the 1990 Amendments to the Clean Air Act because of its ozone-depleting qualities. Defendant's expert also stated that P–22 was too highly pressurized for safe use in the foggers.

At the conclusion of the trial, the jury rendered a verdict based on special interrogatories. It determined that the fogger that had been placed under the stove did not possess a manufacturing

defect. Concerning the design-defect claim, the jury made the following determinations:

3. Did the product as designed have a design defect?

 No.

4. Did the plaintiff, PETER LEWIS, misuse the product, Combat Room Fogger, or use it in a way that was not reasonably foreseeable?

 Yes.

5. If the product was being misused at the time of the accident, was the misuse objectively foreseeable to the manufacturer?

 Yes.

6. Was the design defective, taking into account your answer to Question No. 5?

 Yes.

7. Was the design defect a proximate cause of the accident?

 Yes.

8. Did the plaintiff voluntarily and unreasonably proceed to encounter a known danger in the manner in which he used the Combat Room Fogger?

 Yes.

9. Was the plaintiff's voluntary and unreasonable encountering of a known danger a proximate cause of the accident?

 Yes.

The jury found that plaintiff was fifty percent at fault and that each defendant was twenty-five percent at fault. It then awarded plaintiff damages totaling $275,000. Thereafter, the trial court granted the defendants' motions for judgment notwithstanding the verdict. The court held that plaintiff had not met his burden of proving that P–22 was a feasible and practical design alternative. According to the court, defendants had adduced sufficient proof that P–22 was dangerous. Thus, the jury should not have been asked whether the manufacturer should have incurred the risks of using P–22 rather than those posed by using the hydrocarbon propellant. The court also held that the defendants were entitled to a heeding presumption that people who used the foggers would heed warnings cautioning against their misuse.

On appeal, the Appellate Division reversed the entry of judgment notwithstanding the verdict, reinstated the jury verdict on liability, and remanded the case for a retrial solely on the issue of plaintiff's comparative negligence and on the quantum of damages.

It affirmed the dismissal of plaintiff's failure-to-warn claim and held that the Supreme Court's intervening decision in *Medtronic, Inc. v. Lohr,* 518 *U.S.* 470, 116 *S.Ct.* 2240, 135 *L. Ed.*2d 700 (1996), did not alter the conclusion that FIFRA preempted this claim. 294 *N.J.Super.* at 67, 682 *A.*2d 724.

## II.

 ■ We affirm the lower courts' dismissal of plaintiff's failure-to-warn claim. Plaintiff contends that the foggers' label was inadequate because it did not contain a warning of the product's potential flammability. As a registered insecticide product, the language on the foggers' label was determined by FIFRA and related regulations promulgated by the Environmental Protection Agency (EPA). *See* 7 *U.S.C.A.* §§ 136(p) & 136a(c)(5); 40 *C.F.R.* § 156.10. In short, federal law determined the contents of the warning on the foggers' label. FIFRA contains an express preemption provision prohibiting a state from imposing additional or different labeling requirements. The statute states:

(a) In general

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such state shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

. . . .

[7 *U.S.C.A.* § 136v.]

By the terms of subsection (a), "FIFRA does not wholly oust the states from pesticide regulation." *Grenier v. Vermont Log Bldgs., Inc.,* 96 *F.*3d 559, 563 (1st Cir.1996). Plaintiff's failure-to-warn claim, however, constitutes an imposition of a labeling requirement, which subsection (b) preempts.

In *Cipollone v. Liggett Group, Inc.,* 505 *U.S.* 504, 112 *S.Ct.* 2608, 120 *L. Ed.*2d 407 (1992), the United States Supreme Court held that the Federal Cigarette Labeling and Advertising Act's preemption provision, 15 *U.S.C.* § 1334, preempted both state statuto-

ry requirements and common-law failure-to-warn claims. *Id.* at 523–24, 112 *S.Ct.* at 2621. The court explained, "[I]nsofar as claims under [the plaintiff's] failure to warn theory require a showing that respondents' ... advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted." *Id.* at 524, 112 *S.Ct.* at 2621.

In the instant case, plaintiff alleges that defendants should have included on the label specific information regarding the fogger's flammability and a clearer warning against misuse. Such claims, however, would impose labeling requirements different from those imposed by FIFRA. Federal circuit courts that have reviewed the scope of FIFRA preemption in light of the *Cipollone* decision consistently have held that FIFRA preempts state common-law failure-to-warn claims. *See Grenier, supra,* 96 *F.*3d at 563 ("It was once an open question, but is now settled by the Supreme Court ... that 'requirements' ... presumptively includes state causes of action as well as laws and regulations."); *Taylor AG Indus. v. Pure–Gro,* 54 *F.*3d 555, 560 (9th Cir.1995) (noting seven federal circuit courts have held that FIFRA preempts failure to warn claims based on inadequate labeling); *Hawkins v. Leslie's Poolmart,* 965 *F.Supp.* 566, 569 (D.N.J.1997) (noting numerous federal appellate courts have held FIFRA to preempt state failure-to-warn claims based on similarity between preemption provisions in FIFRA and Cigarette Act).

*Medtronic, Inc. v. Lohr, supra,* 518 *U.S.* 470, 116 *S.Ct.* 2240, 135 *L. Ed.*2d 700, does not alter the conclusion that FIFRA preempts plaintiff's failure-to-warn claim. In *Medtronic,* the Supreme Court allowed the plaintiff Lohr's common-law claims to proceed despite the preemption provision in the Food, Drug, and Cosmetic Act (FDCA), 21 *U.S.C.A.* § 360k(a). The court reasoned that the Medical Device Amendments (MDA) to the FDCA imposed only general federal requirements, which were unlike the specific requirements imposed in *Cipollone. Medtronic, supra,* 518 *U.S.* at 502, 116 *S.Ct.* at 2259. Unlike the MDA, however, FIFRA impos-

es specific labeling language on insecticide products, including the foggers. *See* 40 *C.F.R.* § 156.10.

The required language on a fogger's label may vary depending on the product's chemicals and the test results. FIFRA's requirements, however, remain specific. For example, the EPA categorizes each pesticide according to its toxicity and specifies the language to be used on the pesticide's label. *See* 40 *C.F.R.* § 156.10(h). The category of toxicity in which the EPA places the pesticide determines the language on the label. *See id.* at §§ 156.10(h)(1)(i), (2)(i)–(ii). Similarly, the EPA requires appropriate labels for flammable pesticides. *Id.* at § 156.10(h)(2)(iii). Flammability depends on the results of a "flame extension test," in which the pesticide is sprayed into a paraffin candle's flame. *See* 16 *C.F.R.* § 1500.45. If the flame-extension test reveals a pesticide to be flammable, the EPA regulations assign language based on the pesticide's level of flammability. In sum, the EPA's requirements for labeling pesticides are sufficiently specific to mandate preemption of claims based on state statutes or common law. That conclusion comports with the decisions of an overwhelming majority of federal and state courts that have interpreted the extent of FIFRA preemption in light of *Medtronic. See, e.g., Kuiper v. American Cyanamid Co.*, 131 *F.*3d 656, 662 (7th Cir.1997); *Grenier, supra,* 96 *F.*3d at 563–64; *Lyall v. Leslie's Poolmart,* 984 *F.Supp.* 587, 591–92 (E.D.Mich.1997); *Koch v. Shell Oil Co.*, 173 *F.R.D.* 288, 289 (D.Kan.1997); *Hawkins, supra,* 965 *F.Supp.* at 572; *Ackles v. Luttrell,* 252 *Neb.* 273, 561 *N.W.*2d 573, 579, *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 329, 139 *L. Ed.*2d 255 (1997); *Romah v. Hygienic Sanitation Co.,* 705 *A.*2d 841, 853 (Pa.Super.Ct.1997); *Didier v. Drexel Chem. Co.*, 86 *Wash.App.* 795, 938 *P.*2d 364, 367 (1997).

We reject plaintiff's contention that, under FIFRA, the EPA automatically approves label language proposed by the pesticide manufacturer. The EPA regulations explicitly require specific language to be placed on insecticide labels. *See* 40 *C.F.R.* § 156.10(h). Courts in other jurisdictions have reached the same

conclusion. In *Taylor AG Industries, supra,* 54 *F.*3d 555 (9th Cir.1995), the court rejected an argument identical to that advanced by plaintiff in the instant case, stating:

> Appellants, however, fail to represent accurately the rigorous label-approval process under FIFRA. Although FIFRA does not prescribe the exact contents of labels, manufacturers are not free, as Appellants suggest, to create pesticide labels in any manner they choose. Rather, under 7 *U.S.C.* § 136a(c)(5), the EPA approves each label only· after a careful review of the product data and the draft label. FIFRA cannot impose a specific requirement for warning labels like the 1969 Cigarette Act because FIFRA regulates a wide variety of products that cannot be serviced by a single statement.

[<em>Id.</em> at 560.]

Similarly, in *Welchert v. American Cyanamid, Inc.,* 59 *F.*3d 69 (8th Cir.1995), the court dismissed the plaintiff's suit, which was based on state law, that challenged the accuracy of the language of a herbicide's EPA-mandated label. It stated, "To hold otherwise would be to allow state courts to sit, in effect, as super-EPA review boards that could question the adequacy of the EPA's determination of whether a pesticide registrant successfully complied with the specific labeling requirements of its own regulations." *Id.* at 73; *see also Kuiper, supra,* 131 *F.*3d at 661 (rejecting plaintiff's false-representation claim because it necessarily challenged the EPA-approved label).

Plaintiff asserts that he brought his failure-to-warn claim not to impose additional labeling requirements, but to enforce existing requirements of the EPA. He suggests that pesticide manufacturers could manipulate the language to be placed on their labels by submitting false results from tests on their products. More specifically, plaintiff contends that an accurate flame extension test would have revealed that the foggers were flammable and, thus, subject to a label mandated by the EPA. FIFRA, however, does not contemplate such allegations to take the form of a state-based failure-to-warn claim. FIFRA prohibits, at the risk of criminal and civil penalties, the knowing falsification of any information relating to the testing of a pesticide. 7 *U.S.C.A.* §§ 136j(a)(2)(M) & (Q), 136*l.* Consequently, we perceive no rea-

son to ignore FIFRA's preemption or to permit a supplemental failure-to-warn claim based on state law.

Our holding comports with that of other jurisdictions. In *Lowe v. Sporicidin Int'l*, 47 *F*.3d 124 (4th Cir.1995), the court concluded that FIFRA "does not preempt a state's authority to monitor compliance with labeling or other requirements imposed by FIFRA." *Id.* at 128. The Fourth Circuit nonetheless stated that failure-to-warn claims that challenge the adequacy of an EPA-approved label do not fall within. this "compliance monitoring" function. *Id.* at 129. ("First, any state law claim that would require the defendant to alter its EPA-approved warning label, labeling, or packaging to avoid liability is preempted. Second, a failure to warn claim that contends that the *same* language that constitutes an EPA-approved label, labeling, or packaging is inadequate is preempted . . . .") (citations omitted); *see also Kuiper, supra*, 131 *F*.3d at 666 ("In short, FIFRA does not allow states to second-guess EPA's labeling decisions under the guise of enforcing the requirements of FIFRA itself."). Plaintiff attempts to paint his failure-to-warn claim as simply state "compliance monitoring." His claim, however, necessarily entails a preempted challenge to the fogger's label as approved by the EPA.

### III.

While deliberating on the issue of plaintiff's comparative negligence, the jury asked about special interrogatory number eight, which inquired whether plaintiff had encountered a "known danger." The purpose of the jury's question was to ascertain whether plaintiff needed to know specifically that he might be burned if he misused the product. In response, the court stated that plaintiff needed to have known only that he was taking a general risk by reentering the room and need not have been aware of the specific risk that resulted in his injury. The Appellate Division ruled that this instruction was erroneous as a matter of law. 294 *N.J.Super.* at 79, 682 *A*.2d 724. We agree. For plaintiff to be held comparatively negligent, he must have volun-

tarily and unreasonably encountered the known risk of being burned. *See Johansen v. Makita U.S.A., Inc.*, 128 *N.J.* 86, 94, 607 *A.*2d 637 (1992); *Cartel Capital Corp. v. Fireco of New Jersey*, 81 *N.J.* 548, 562–63, 410 *A.*2d 674 (1980); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 158, 406 *A.*2d 140 (1979); *Crumb v. Black & Decker (U.S., Inc.)*, 204 *N.J.Super.* 521, 530, 499 *A.*2d 530 (App.Div.1985), *certif. dismissed*, 104 *N.J.* 432, 517 *A.*2d 425 (1986); *see also Restatement (Second) of Torts* § 402A cmt. n (1965) ("[T]he form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense...."). Consequently, we affirm the Appellate Division's decision to remand for a retrial the issue of plaintiff's comparative negligence.

We believe, however, that the issues of defendants' liability and plaintiff's comparative negligence must be considered together. The special interrogatories inquired twice whether the foggers possessed a design defect. In answer to question three, the jury found that the foggers, as designed, did not possess a design defect. In answer to question six, however, the jury found that the design was defective when taking into account plaintiff's objectively foreseeable misuse. Contrary to defendant's contention, we find that these answers were neither inconsistent nor did they prove that the jury rejected P–22 as an alternative design. The instructions reveal that the purpose of question three was to determine if the foggers were defectively designed in their original state. By comparison, the purpose of question six was to determine if the product was defectively designed when considering plaintiff's foreseeable misuse. Although the jury determined that the foggers were not defective in their original state, plaintiff could have prevailed if the jury determined that the foggers' design was defective in light of his foreseeable misuse. *Jurado v. Western Gear Works*, 131 *N.J.* 375, 386, 619 *A.*2d 1312 (1993); *Soler v. Castmaster*, 98 *N.J.* 137, 151, 484 *A.*2d 1225 (1984). The jury's finding that the fogger's design was defective in light of plaintiff's objectively foreseeable misuse could support a verdict on

the design-defect claim only if the jury concluded that a practical and feasible alternative would have reduced or eliminated plaintiff's harm.

 When instructing the jury on the design-defect issue, the court specifically referred to P–22, plaintiff's proposed alternative design of the propellant. By contrast, the court did not mention P–22 when instructing the jury on question six, which took into account plaintiff's objectively foreseeable misuse. To succeed on his design-defect claim, plaintiff was required to prove that a practical and feasible alternative design existed that would have reduced or prevented his harm. *See Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 74, 577 *A.*2d 1239 (1990); *Smith v. Keller Ladder Co.,* 275 *N.J.Super.* 280, 284–85, 645 *A.*2d 1269 (App.Div. 1994); *see also Restatement (Third) of Torts: Product Liability* § 2 cmt. f (Proposed Final Draft, 1997) ("To establish a prima facie case of defect, plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm."). Plaintiff attempted to meet this burden by submitting P–22 as such an alternative. To determine if P–22 was a practical and feasible alternative design, the jury was required to perform a risk-utility analysis. *Jurado, supra,* 131 *N.J.* at 375, 619 *A.*2d 1312; *Johnson v. Salem Corp.,* 97 *N.J.* 78, 88, 477 *A.*2d 1246 (1984); *O'Brien v. Muskin Corp.,* 94 *N.J.* 169, 181–82, 463 *A.*2d 298 (1983).

 Although the court instructed the jury on the "risk-utility index" to apply in evaluating P–22, it did not instruct the jury similarly to evaluate P–22 when considering whether plaintiff's misuse was objectively foreseeable. Thus, the jury's answer to question three that the fogger was not defective may have represented its rejection of P–22 as an alternative design. Its finding that the product was defective in answer to question six may not have been based on its acceptance of P–22 as an alternative design. Alternatively, the jury's apparently inconsistent answers on the issue of whether the foggers were defective might have represented its conclusion that the foggers, when not misused,

were not designed defectively. Instead, the jury could have concluded in light of plaintiff's foreseeable misuse that the design of the foggers was defective because of the failure to include P–22 as an alternative design. The absence of a clear instruction forces us to speculate about the meaning of the jury's findings. Consequently, we must remand the issue of defendants' liability for retrial. *Jurado, supra,* 131 *N.J.* at 390–91, 619 *A.*2d 1312.

Because the issues of plaintiff's comparative negligence and defendants' liability intertwine, it would be inappropriate to remand one without the other. A partial retrial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.,* 283 *U.S.* 494, 500, 51 *S.Ct.* 513, 515, 75 *L. Ed.* 1188 (1931). The issue of plaintiff's comparative negligence is not separate from that of defendants' liability. In determining whether plaintiff was comparatively negligent, the jury must determine whether plaintiff was aware of the specific risk of being burned when he reentered the room. *See Cartel Capital, supra,* 81 *N.J.* at 562–63, 410 *A.*2d 674. Because the parties dispute plaintiff's comparative negligence, his negligence and defendants' liability should be retried together. *Acken v. Campbell,* 67 *N.J.* 585, 589, 342 *A.*2d 172 (1975); *see Moraca v. Ford Motor Co.* 66 *N.J.* 454, 460–61, 332 *A.*2d 599 (1975) (finding issues of contributory negligence and defendant's liability not separable); *Finley v. Wiley,* 103 *N.J.Super.* 95, 104, 246 *A.*2d 715 (App.Div.1968) (remanding for new trial on all issues because issue of defendant's negligence and plaintiff's contributory negligence were closely related and intertwined); *see also McClelland v. Scholz,* 366 *Mich.* 423, 115 *N.W.*2d 120, 122 (1962) (holding that where defendant pleaded contributory negligence and jury's answers were not dispositive on question, fairness requires reversal and remand for new trial on all issues properly in case); *Otis Elevator Co. v. Bedre,* 776 *S.W.*2d 152, 153 (Tex.1989) (holding issue of plaintiff's contributory negligence and defendant's liability to be "indivisible"). Typically,

"issues of negligence and causation are so interrelated that both issues must be retried." *Ahn v. Kim,* 145 *N.J.* 423, 434, 678 *A.*2d 1073 (1996); *see Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 410, 678 *A.*2d 1060 (1996). A remand should be limited to the issue of comparative negligence only if that issue is "entirely distinct and separable" from defendants' liability. *Ahn, supra,* 145 *N.J.* at 434, 678 *A.*2d 1073. In this case, the issues of plaintiff's negligence and defendants' liability do not meet this standard.

If, on retrial, the jury determines that plaintiff was aware of the specific risk of being burned, it must then determine the extent to which his negligence caused his injuries. *N.J.S.A.* 2A:15–5.1 to 5.2. The jury must evaluate "the extent, in the form of a percentage, of each parties' negligence or fault." *N.J.S.A.* 2A:15–5.2a(2). It must assess the parties' fault such that "the total of all percentages of negligence or fault of all the parties to a suit shall be 100%." *Ibid.* At trial, the jury found plaintiff to be fifty percent at fault and each defendant to be twenty-five percent at fault. If on remand the jury considers only the percentage of plaintiff's fault, leaving in effect the original finding that the total fault attributable to defendants was fifty percent, the total of all percentages of fault might be greater or less than 100 percent.

*Cartel Capital, supra,* 81 *N.J.* 548, 410 *A.*2d 674, on which plaintiff relies, is distinguishable. In *Cartel Capital,* we determined as a matter of law that the plaintiff was not contributorily negligent. *Id.* at 563, 410 *A.*2d 674. Consequently, we eliminated the jury's apportionment of plaintiff's fault and revised the jury's apportionment of the fault of the two defendants proportionally to equal 100 percent. *Id.* at 570, 410 *A.*2d 674. Here, however, on remand, the jury is to consider the fault of all parties, including that of plaintiff. To preserve the finding of defendant's fault could force the court to recompute either that finding or the finding of the jury in assessing plaintiffs' fault on remand.

As with tort claims generally, causation is an element of a design-defect claim. *O'Brien, supra,* 94 *N.J.* at 179, 463 *A.*2d 298; *see also Coffman v. Keene Corp.,* 133 *N.J.* 581, 594, 628 *A.*2d

710 (1993) ("Causation is a fundamental requisite for establishing any product-liability action."). Consequently a determination that plaintiff had been negligent in encountering a known risk would require the jury to compare the degree to which his negligence contributed to the cause of the accident with the degree to which defendants were at fault. *See Ahn, supra,* 145 *N.J.* at 434, 678 *A.*2d 1073. Such a determination could involve a number of considerations, such as the flammability of the hydrocarbon used in the fogger as compared to the flammability of P–22, the possibility that plaintiff's presence could have caused a static spark igniting the hydrocarbon, and the level to which the room had been saturated by the foggers' contents.

Contrary to the Appellate Division, 294 *N.J.Super.* at 81, 682 *A.*2d 724, the remand should not include the issue of damages. The jury instruction on damages, although it did not literally follow the model charge, was substantially correct. Plaintiff's own physician acknowledged that plaintiff had made a good recovery and that his only permanent injury consisted of scars that were generally flat. The instruction did not have the clear capacity to produce an unjust result. *R.* 2:10–2; *see Lesniak v. County of Bergen,* 117 *N.J.* 12, 20–21, 563 *A.*2d 795 (1989).

## IV.

Defendants argue that plaintiff's design-defect claim should fail because plaintiff did not obey the instruction on the foggers' label to "leave [the] treated area for 2 hours" after activating the foggers. Contrary to these instructions, plaintiff reentered his kitchen approximately one minute after activating the foggers.

To support their argument, defendants rely on *Coffman v. Keene Corp., supra,* 133 *N.J.* 581, 628 *A.*2d 710. In *Coffman,* we upheld the trial court's use of a heeding presumption, which instructed the jury to presume the plaintiff would have obeyed a product warning if one had existed. *Id.* at 594, 628 *A.*2d 710. Defendants argue that because, in *Coffman,* the absence of warnings justified a presumption against the defendants, then, in this

case, the presence of warnings should insulate defendants from liability. We disagree.

In *Coffman*, the basis of the plaintiff's claim was the defendant's failure to warn of the dangers of asbestos. *Id.* at 590, 628 *A.*2d 710. Here, by comparison, plaintiff's failure-to-warn claim has been dismissed, and plaintiff is limited on remand to his design-defect claim. A claim for failure to warn differs from one based on a design defect. *N.J.S.A.* 2A:58C–2; *Zaza v. Marquess & Nell, Inc.,* 144 *N.J.* 34, 48, 675 *A.*2d 620 (1996). *See Dixon v. Jacobsen Mfg. Co.,* 270 *N.J.Super.* 569, 637 *A.*2d 915 (App.Div.), *certif. denied,* 136 *N.J.* 295, 642 *A.*2d 1004 (1994); *Seeley v. Cincinnati Shaper Co.,* 256 *N.J.Super.* 1, 14, 606 *A.*2d 378 (App. Div.), *certif. denied,* 130 *N.J.* 598, 617 *A.*2d 1220 (1992); *cf. Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229, 242–43, 432 *A.*2d 925 (noting manufacturer may not have met duty to warn, "even if the product is perfectly inspected, designed, and manufactured"). *Compare N.J.S.A.* 2A:58C–3a(1) (providing defendants in design-defect case with absolute defense if design of product was state of the art at time it left their control), *with N.J.S.A.* 2A:58C–4 (imposing continuing duty to warn on defendants in failure to warn cases).

*Coffman* also is distinguishable because the heeding presumption in that case encourages manufacturers to place warnings on potentially dangerous products. 133 *N.J.* at 602–03, 628 *A.*2d 710. Allowing such a warning to defeat a design-defect claim would not encourage manufacturers to place such warnings on their products. Indeed, it would frustrate the imposition of liability when a product's design fails to take into account an injured party's objectively foreseeable misuse of the product. *See Jurado, supra,* 131 *N.J.* at 385, 619 *A.*2d 1312; *Brown v. United States Stove Co.,* 98 *N.J.* 155, 170, 484 *A.*2d 1234 (1984). Accordingly, we hold that the jury, when considering plaintiff's reasonably foreseeable misuse, must decide whether the foggers' design was defective despite the presence of warnings cautioning against such misuse. *O'Brien, supra,* 94 *N.J.* at 186, 463 *A.*2d 298.

## V.

Finally, we turn to the question whether the feasibility and practicality of an alternative design that included P–22 as a propellant was an issue for the court or for the jury. United contends that the use of P–22 would have posed risks equal to or greater than the risk of flammability to which plaintiff was exposed. For this reason, United argues that the court, not the jury, should have decided whether P–22 was a practical and feasible alternative to the hydrocarbon propellant used in the foggers. Plaintiff disagrees and argues that the practicality and feasibility of P–22 was a disputed factual question properly left to the jury.

At trial, the parties contested the dangers of P–22 and the date on which these dangers became known. The accident took place in July 1989. Consequently, the parties assumed that the foggers used by plaintiff were manufactured sometime in 1988 or 1989. Thus, the relevant issue was whether in 1988 and 1989 the known risks of P–22 precluded its use as an alternative and nonflammable propellant. So framed, the issue is not what is known in 1998 or at the time of trial, but what was known ten years ago, when the foggers left defendant's control.

Plaintiff's expert witness, Wilbur Boyer, testified that combining P–22 with the hydrocarbon propellant used in the foggers would have created a propellant that was three times less flammable. The inclusion of P–22 would have "completely minimize[d] or eliminate[d]" the possibility of the fogger exploding. United did not challenge the fact that a P–22–based propellant would be less flammable. Instead, United elicited on cross-examination of Boyer that he had not calculated the actual concentration of propellant in the air at the time of plaintiff's accident. Through this examination, United suggested that the concentration of propellant could have been sufficiently high so that even a P–22–based propellant would have exploded.

In addition, United adduced testimony from its own expert, Montford Johnsen, regarding the hazards of P–22. Specifically,

United alleged that P–22 was a suspected teratogen, that it was an ozone-depleter, and that it was so highly pressurized that it could not be used in the fogger without risking explosion.

Both Johnsen and Boyer acknowledged the existence of conflicting studies regarding the teratogenicity of P–22. Boyer cited an August 1987 report by DuPont, an American-based manufacturer of P–22, which concluded that there was no evidence of teratogenicity. He acknowledged, however, that in 1988, a European manufacturer, because of P–22's potentially teratogenic qualities, stopped selling P–22 for general aerosol use. Johnsen testified that he had received a phone call in 1981 or 1982 from a DuPont executive who told him that P–22 was a suspected teratogen. As Johnsen acknowledged, however, subsequent DuPont studies concluded that the compound was not teratogenic. Johnsen also acknowledged that in a book he had written in 1982 he stated that toxicological studies of P–22 looked "extremely encouraging" and that, because of its low flammability, P–22 would become "the workhorse of the industry."

Both experts admitted that at the time of trial P–22 was banned from use under a 1990 amendment to the Clean Air Act. That amendment mandated phasing out the compound by the early 1990s because of its ozone-depleting qualities. Johnsen testified that as early as 1989 the Montreal Protocol, an international agreement establishing limits and reductions on the use of ozone-depleting substances, see Montreal Protocol on Substances That Deplete the Ozone Layer, Sept. 16, 1987, 26 *I.L.M.* 1550 (entered into force Jan. 1, 1989), recognized P–22 as an ozone-depleter. By 1989, aerosol marketers would have been aware that P–22 "was looked at very askance by the world authorities." According to Johnsen, P–22 was a more highly pressurized compound than the hydrocarbon propellant and, if used in the foggers, would have created an increased danger of explosion.

Despite these assertions, Johnsen, like Boyer, testified that other manufacturers of foggers used P–22 as a propellant in 1988 and 1989. Boyer noted that a variety of aerosol products used P–

22 as a propellant, including insecticide foggers such as "Dr. Doom," the "Bengal Endure" fogger, and the "Bengal Roach Spray and Duster." Johnsen confirmed the use of P–22 in the "Dr. Doom" fogger and in the Bengal line of foggers.

After the jury returned a verdict finding each defendant twenty-five percent liable for plaintiff's accident, the trial court granted United's motion for a judgment notwithstanding the verdict. The court concluded that "so long as there was sufficient evidence of the reality of the danger of an alternative design," the jury should not consider P–22 as an alternative.

The Appellate Division reversed, holding that the trial court had erred in entering the judgment because the evidence "did not prove with the requisite certainty that in 1988 and 1989 the deleterious effects of P–22 were believed to be so probable and of such magnitude that its use as an aerosol propellant would have been unreasonable." 294 *N.J.Super.* at 70, 682 *A.*2d 724. Our analysis of the record leads to the same conclusion. The deleterious effects of P–22 were not so clear in 1988 and 1989 that the trial court should have prevented the jury from considering whether P–22 provided a practical and feasible alternative design of the propellant.

The test for review of a motion for a judgment notwithstanding the verdict is the same as the test for review of a motion for involuntary dismissal. Pressler, *Current N.J. Court Rules,* comment on *R.* 4:40–2 (1998); *see Finnegan v. Havir Mfg. Corp.,* 60 *N.J.* 413, 421, 290 *A.*2d 286 (1972). A court must accept as true all evidence supporting the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced therefrom. If reasonable minds could differ, the motion must be denied. *R.* 4:37–2; *Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.*2d 706 (1969). This test, which applies to civil actions generally, also applies to products liability actions. *Johnson v. Salem Corp.,* 97 *N.J.* 78, 92, 477 *A.*2d 1246 (1984). The purpose of the test is to ensure that the jury resolves disputed factual matters. *Id.* at 89, 477 *A.*2d 1246;

*O'Brien, supra*, 94 *N.J.* at 186, 463 *A.*2d 298 ("If, however, there is a fact question whether the risks outweigh the utility of the product, then the matter is for the trier of fact."). Except in the rare case when the risk-utility analysis points to the appropriate result as a matter of law, the jury, not the court, ultimately resolves factual issues arising from a risk-utility analysis. *See* Dreier et al., *Current N.J. Products Liability and Toxic Torts Law*, § 5.2 at 29 (1998) (discussing roles of court and jury in risk utility analysis). Thus, if the proofs supporting the position of the non-moving party and the reasonable inferences drawn therefrom reveal a contested issue of fact regarding the practicality and feasibility of a proposed alternative design, the issue should be resolved by the jury. *See* Pressler, *supra*, comment 2 on *R.* 4:37–2 (1998) (discussing judicial function in reviewing motion for involuntary dismissal).

 Here, the record reveals disputed issues of material facts regarding the practicality and feasibility of P–22. On the teratogenicity issue, both experts acknowledged DuPont studies concluding that P–22 was not a teratogen. In Johnsen's own book, he noted favorable toxicological studies on P–22 and lauded the compound as the industry's future workhorse.

When reviewing United's motions for a judgment notwithstanding the verdict, the trial court failed to view Johnsen's testimony in a light most favorable to the plaintiff. Additionally, the court stated that at the time of trial the EPA had banned P–22 for all uses in part because "it was considered likely to cause birth defects." The record, however, does not support this contention. Furthermore, as discussed more fully below, the practicality and feasibility of P–22 as an alternative must be evaluated according to the state of knowledge at the time the fogger was manufactured, not at the time of trial.

On the ozone-depletion issue, both parties acknowledged that, in 1988 and 1989, P–22 was not banned from use in aerosol products. *See Ladner v. Mercedes–Benz of North America, Inc.*, 266 *N.J.Super.* 481, 500, 630 *A.*2d 308 (App.Div.1993) (stating that regulations

must be in effect at time of manufacture to establish standard for design), *certif. denied,* 135 *N.J.* 302, 639 *A.*2d 301 (1994); *Restatement (Third) of Torts* § 4 cmt. b (1997) (same); *see also Grzanka v. Pfeifer,* 301 *N.J.Super.* 563, 583, 694 *A.*2d 295 (App.Div.1997) (rejecting conclusion of design-defect plaintiff's expert that was based on observations made years after accident and not on the conditions existing at time of accident). Moreover, both experts acknowledged that P–22 was used in other aerosol products, including foggers designed by two other manufacturers. *Cf. Johnson, supra,* 97 *N.J.* at 89, 477 *A.*2d 1246 (noting that safer design proposed by plaintiff was known to industry at time allegedly defective product was manufactured); *Crispin v. Volkswagenwerk AG,* 248 *N.J.Super.* 540, 560, 591 *A.*2d 966 (App.Div.) (determining plaintiff established *prima facie* case of design defect in part by introducing evidence that safer alternative designs had been tested for, but not incorporated in, production of allegedly-defective product), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991). This evidence, when viewed in the light most favorable to plaintiff, could support a jury verdict that P–22 was a practical and feasible alternative propellant that could have been used by defendant in 1988 and 1989. *See Restatement (Third) of Torts: Products Liability* § 2 cmt. f (Proposed Final Draft, 1997) (noting on proof of sufficient evidence of reasonable alternative, issue is for trier of fact); *see also Johnson, supra,* 97 *N.J.* at 92–93, 477 *A.*2d 1246 (holding judgment *n.o.v.* appropriate only when moving party's proofs are both uncontroverted and reliable).

When granting United's motions for a judgment notwithstanding the verdict, the trial court proceeded on the premise that whether P–22 presented a practical and feasible design was a matter of public policy to be decided by the court rather than the jury. In so proceeding, the court relied on *Shackil v. Lederle Labs.,* 116 *N.J.* 155, 561 *A.*2d 511 (1989). *Shackil,* however, is distinguishable. It dealt with a design-defect case against the manufacturer of a DPT vaccine. *Id.* at 158, 561 *A.*2d 511. In *Shackil,* we declined to allow a jury to consider whether the vaccine constituted an "unavoidably dangerous" design defect, *id.* at 189, 561 *A.*2d 511, and thus defeated plaintiff's ability to

proceed on a theory of market share liability. *Id.* at 190–91, 561 A.2d 511. We acknowledged "a painful reality—that the excessive exposure to liability that imposition of this novel theory would produce would inevitably discourage highly useful activity." *Id.* at 191, 561 A.2d 511. As useful as insecticides may be, they are not as beneficial as childhood vaccines. *See ibid.* (noting opinion is "confined solely to the context of vaccines" and should not be considered *per se* bar to imposition of market share liability in appropriate context).

United argues that the trial court should not have permitted the jury to decide whether to accept the potential risks of P–22 in order to reduce the risk of flammability posed by the hydrocarbon propellant. In essence, United seeks immunity from liability resulting from its decision to use a more flammable propellant than one that was a suspected teratogen and ozone-depleter. So fact sensitive a determination, however, is particularly amenable to risk-utility analysis by a jury. An insecticide manufacturer such as United may be subject to damage awards because of its decision to use a propellant more flammable than P–22. Although this liability may discourage the future manufacture of foggers, this possibility is less alarming than that of discouraging the manufacture of vaccines. In sum, insufficient public policy grounds exist to justify the removal of this disputed factual issue from the jury.

Our decision to sustain the denial of defendant's motion for a judgment notwithstanding the verdict should not be interpreted as altering the parties' respective burdens of proof. In a design-defect case, the plaintiff bears the burden of proof. *N.J.S.A.* 2A:58C–2; *Fabian v. Minster Mach. Co.*, 258 *N.J.Super.* 261, 271, 609 A.2d 487 (App.Div.), *certif. denied*, 130 *N.J.* 598, 617 A.2d 1220 (1992). A plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm. *See O'Brien, supra*, 94 *N.J.* at 181, 463 A.2d 298; *Smith v. Keller Ladder Co., supra*, 275 *N.J.Super.* at 284–85,

645 *A.*2d 1269. Plaintiffs who assert that the product could have been designed more safely must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible. *See Macri v. Ames McDonough Co.,* 211 *N.J.Super.* 636, 641, 512 *A.*2d 548 (App.Div.1986).

In the instant case, we conclude that plaintiff has established a *prima facie* case that P–22 was a practical and feasible alternative design that would have reduced the flammability of the foggers' propellant. Consequently, we uphold the Appellate Division's decision to reverse the entry of judgment notwithstanding the verdict. We take no position, however, on the issue whether plaintiff has met his burden. This is an issue for the jury to decide at retrial.

Even if plaintiff can prove that P–22 was a safer, practical and feasible alternative design, defendant may assert the "state-of-the-art" affirmative defense. *N.J.S.A.* 2A:58C–3a(1); *see Roberts v. Rich Foods, Inc.,* 139 *N.J.* 365, 375, 654 *A.*2d 1365 (1995); *Fabian, supra,* 258 *N.J.Super.* at 271, 609 *A.*2d 487. Under that defense, the manufacturer or seller shall not be liable if:

> At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product.
>
> [*N.J.S.A.* 2A:58C–3a(1).]

United bears the burden of proving that its design of the foggers represented the state of the art. *See Roberts, supra,* 139 *N.J.* at 378, 654 *A.*2d 1365; *see also* Biunno, *Current N.J. Rules of Evidence,* comment 2 on *N.J.R.E.* 101(b)(1) (1995) (noting Product Liability Act placed burden on defendant to prove state-of-the-art affirmative defense). Thus, if United can prove that P–22 was not a practical and feasible alternative at the time the foggers left its control, it would not be liable for the alleged design defect. *See Fabian, supra,* 258 *N.J.Super.* at 274, 609 *A.*2d 487; *see also Feldman v. Lederle Labs.,* 97 *N.J.* 429, 456, 479 *A.*2d 374 (1984) ("As a matter of policy, the burden of proving the status of

knowledge in the field at the time of distribution is properly placed on the defendant.").

■ · At trial, United contended that when the foggers left its control, P–22 was known to be an ozone-depleter and suspected to be a teratogen, thereby eliminating its use as an alternative propellant. Plaintiff, however, has contested the issue of whether these alleged dangers were known to exist at the time the foggers left United's control. Whether United has proven the state-of-the-art defense is therefore a factual issue best left to the jury. It is for the jury to decide whether United has proven that P–22 was not a practical and feasible alternative at the time the foggers left defendant's control. On retrial, if the jury finds that United has proven the state-of-the-art defense, defendant would not be liable for the alleged design defect. *See Dixon, supra,* 270 *N.J.Super.* at 582, 637 *A.*2d 915 ("[A] manufacturer enjoys an absolute state-of-the-art defense for design defect claims."); *Fabian, supra,* 258 *N.J.Super.* at 271, 609 *A.*2d 487 (noting Product Liability Act converted state of the art into an absolute defense).

■ The disposition of this issue turns on the time when the dangers of plaintiff's proposed alternative design became known. By the mid–1990's, the Clean Air Act barred the use of P–22 as a propellant. The accident, however, occurred in 1989. It would be unfair to impute to a manufacturer in 1988 or 1989 facts that did not occur until after 1990. If the foggers that injured plaintiff had been manufactured in the mid–1990's, by which time P–22 had been banned by the Clean Air Act, defendant's state-of-the-art defense would bar any liability for its decision not to use that compound. A plaintiff may not succeed on an alternative design theory that would have required the defendant manufacturer to violate the law. P–22, however, was not banned from general aerosol use in 1988 or 1989. In fact, two of United's competitors manufactured foggers using P–22 as a propellant. At retrial, the jury must weigh the conflicting expert testimony to determine the state of knowledge in 1988 and 1989 regarding the deleterious

effects of P–22 and the reasonableness of United's choice to expose plaintiff to a propellant more flammable than P–22.

As indicated, plaintiff contends that if the foggers had contained P–22, they would not have burned him. Further, he asserts that at the time of his accident, defendants could have made and sold foggers using P–22. Indeed, at that time other manufacturers were using P–22 as a propellant. Five years after the accident, however, the federal government banned P–22, not out of concerns for flammability, but as a political decision to advance the preservation of the ozone layer. *See Restatement (Third) of Torts: Products Liability* § 4 cmt. c (Proposed Final Draft, 1997) (noting that "the safety statute or administrative regulation must be such that compliance reduces the risk that caused the plaintiff's harm").

The dissent contends that the subsequent ban immunizes defendants from liability for not using P–22 at a time when it was not banned. Presumably, if the federal government had adopted a policy allowing the use of P–22, the dissent would hold that defendants should compensate plaintiff for burning him in 1989. In either case, the analysis would be flawed. *See Restatement (Third) of Torts: Products Liability* § 4 cmt. b (Proposed Final Draft, 1997) (noting that "the product safety statute or administrative regulation must have been in force and applicable at the time of sale or other distribution"). Defendants in products liability actions should be judged not on what occurs in the future, but on what they knew or should have known at the time their products left their control.

Contrary to the dissent, that "the factual basis for [the subsequent] ban was known or knowable to the manufacturing community when it marketed the product," *post* at 577, 715 *A.2d* at 983, is not dispositive as a matter of law. Under New Jersey law, "codes or regulations not in effect at the time of manufacture of the product cannot be admitted to establish the standard for that design." *Ladner, supra,* 266 *N.J.Super.* at 500, 630 *A.2d* 308; *see also Cepeda v. Cumberland Eng'g Co.,* 76 *N.J.* 152, 193, 386 *A.2d* 816 (1978) (noting "safety codes *in existence* when a machine

is marketed are admissible") (emphasis added), *overruled on other grounds, Suter, supra,* 81 *N.J.* at 158, 406 *A.*2d 140; *Feldman v. Lederle Laboratories,* 234 *N.J.Super.* 559, 595, 561 *A.*2d 288 (App.Div.1989) ("[O]nly regulations applicable at the time of marketing are relevant."), *overruled on other grounds,* 125 *N.J.* 117, 592 *A.*2d 1176 (1991); *Restatement (Third) of Torts* § 4 cmt. b (1997); Dreier et al., *supra,* § 5:3–6 at 45 (noting the "underlying proposition" that "changes in industry or government standards after manufacture of a product do not change the determination of whether it was defectively designed at the time of manufacture").

■ Analysis of the state-of-the-art defense confirms that conclusion. As noted, the Products Liability Act, judicial decisions, and legal scholars recognize that the time to measure that defense is when the product leaves the defendant's control. Plaintiffs in products liability actions often try to prove that a product was defective because a safer alternative design existed when the product left the defendant's control. Defendants have an absolute defense if they can prove that at that time, a safer alternative was neither practical nor feasible. *N.J.S.A.* 2A:58C–3a(1). Plaintiffs, then, may not defeat the state-of-the-art defense by proving that a safer alternative became available after the product left the defendant's control.

The Products Liability Act, which was in effect at the time the subject foggers left defendants' control, provides manufacturers with an absolute state-of-the-art defense. *Ibid.; Dixon, supra,* 270 *N.J.Super.* at 582, 637 *A.*2d 915. By its terms, this defense focuses on "the time the product left the control of the manufacturer." *N.J.S.A.* 2A:58C–3a(1). Because of this focus, a plaintiff cannot propose an alternative design that was not "practical and technically feasible" at the time of the product's manufacture. *Ibid.; see* Dreier et al., *supra,* § 5:3–3 at 39 (noting that "it is the state of the art at the time of manufacture which is at issue when determining whether or not a product is defective"); *see also Restatement (Third) of Torts* § 2 cmt. d (noting that "the plaintiff must prove that such a reasonable alternative was, or reasonably

could have been, available at time of sale or distribution"). If, in the instant case, plaintiff had submitted an alternative propellant that had not been developed at the time of manufacture, his claim would be barred by the state-of-the-art defense as a matter of law.

Judicial decisions likewise look to the time when the product left the manufacturer's control. In a design-defect case, the critical time for measuring the state of technological knowledge imputed to a manufacturer is the time of manufacture. *Feldman, supra,* 97 *N.J.* at 455–56, 479 *A.*2d 374; *Fabian, supra,* 258 *N.J.Super.* at 274, 609 *A.*2d 487; *Crispin, supra,* 248 *N.J.Super.* at 557–58, 591 *A.*2d 966. Only in asbestos cases is a manufacturer precluded from asserting the state-of-the-art defense, despite the fact that the harms of asbestos were not known to the scientific community at the time of manufacture. *Beshada v. Johns–Manville Prods. Corp.,* 90 *N.J.* 191, 447 *A.*2d 539 (1982). For other products, the general rule remains that the relevant time that could determine the state-of-the-art is the time when the product leaves the defendant's control.

Products liability law, as the dissent acknowledges, should be symmetrical. *Post* at 581, 715 *A.*2d at 985. Yet, the dissent advocates a result that is asymmetrical. The dissent acknowledges that at the time of manufacture, defendants could have used P–22 as a propellant. At that time, moreover, the use of P–22 would not have subjected defendants to any liability under state or federal law. Thus, contrary to the dissent, defendants did not confront a dilemma. Only by warping time can the dissent manufacture a dilemma for defendants. By looking back to the future, the dissent asserts that a ban imposed in 1993 created a dilemma for a manufacturer in 1988. In fact, however, no dilemma existed in 1988. The thrust of plaintiff's proof was that defendants could have used P–22 without incurring liability to anyone, and that such use of P–22 would have produced a fogger that did not burn plaintiff.

We also disagree with the dissent's argument that the wrong incentives arise from permitting a jury to find that defendants

should have used P–22 as a propellant in 1988. The predicate for that argument is that at the time of manufacture, P–22 "was looked at askance by world authorities." Assuming that a jury accepted defendants' thesis, the fact remains that defendants still could have made foggers using P–22 as a propellant. The dissent, however, concludes as a matter of law that instead of using a safer alternative, manufacturers in 1988 were obligated to use a propellant that burned people. That conclusion defeats, rather than advances, the purpose of tort law as a deterrent to causing personal injuries.

Contrary to the dissent, *post* at 579, 715 *A.2d* at 984, moreover, we do not presume to impose "a duty on defendants to manufacture or sell a fogger with P–22." The imposition of such a duty today, unlike in 1988, would violate federal policy. It also would usurp the vital role of the jury.

Fundamental to products liability law is the premise that, when the material facts are in dispute, the jury, not the court, makes the risk-utility assessment. *See Restatement (Third) of Torts: Products Liability* § 2 cmt. f (Proposed Final Draft, 1997) (noting that when sufficient evidence is presented such that "reasonable persons could conclude that a reasonable alternative could have been practically adopted," the issue is then for the trier of fact to decide). The dissent reasons that in 1988, P–22's risk to the ozone layer outweighed its usefulness as a safer alternative to a hydrocarbon propellant. A jury might adopt that reasoning. But it might not. Either way, the jury, not the court, should conduct the risk-utility analysis. When making such an analysis, the jury should evaluate, among other things, "[t]he availability of a substitute product which would meet the same need and not be as unsafe." *O'Brien, supra,* 94 *N.J.* at 183, 463 *A.2d* 298. Only if the evidence, when viewed in the light most favorable to the plaintiff, cannot reasonably support plaintiff's proposed design as a practical and feasible alternative, may the court decide that plaintiff's design-defect claim fails as a matter of law. *Id.* at 185,

463 *A.2d* 298. Like the Appellate Division, we conclude that a jury so viewing the evidence could find that in 1988 P–22 was a safer alternative design.

In sum, our decision to affirm the reversal of the judgment notwithstanding the verdict follows from the existence of contested issue of material fact. At retrial, plaintiff must prove by a preponderance of the evidence that P–22 was a practical and feasible alternative design that would have significantly reduced the risk of flammability. Even if plaintiff meets this burden, defendants can still avoid liability by proving the state-of-the-art defense. *N.J.S.A.* 2A:58C–3a(1).

The judgment of the Appellate Division is affirmed as modified.

HANDLER, J., concurring in part and dissenting in part.

The Court forces defendants between Scylla and Charybdis. It accepts plaintiff's assertion that United Industries's product, the Combat Room Fogger, may have been defective because it was flammable. It also accepts plaintiff's proposal that a jury should determine whether United Industries should have designed its fogger to contain P–22, a known ozone depleter and a suspected teratogen. By its ruling, the Court, in effect, is telling manufacturers to pick their poison. That kind of judicial admonition cannot be the law.

Following the enactment of the Clean Air Act Amendments of 1990, the federal government, attempting to preserve the ozone layer, banned P–22. As a matter of public policy and fairness, a manufacturer should not have the duty to design a product with a substance that has subsequently been outlawed so long as the factual basis for that ban was known or knowable to the manufacturing community when it made or marketed the product. Otherwise, a manufacturer would face the Catch–22 of being liable for either creating a product that does not contain an unsafe, subsequently banned substance or for exposing people to the unsafe, subsequently banned substance and causing the harms that prompted the prohibition.

I agree that plaintiff's failure-to-warn claim was correctly dismissed. However, I depart from the majority in its disposition of plaintiff's design-defect claim. In my opinion, as a matter of law, defendants owed plaintiff no duty to design or sell a fogger with P–22 because the substance has been banned and defendants knew or should have known the reason for the proscription. Accordingly, I would reverse the Appellate Division's reversal of the trial court's granting defendants' motion for judgment notwithstanding the verdict. Because plaintiff cannot establish that defendants owed him a duty, the issues of plaintiff's comparative negligence and the trial court's erroneous instructions are rendered moot.

I

"The issue whether a defendant owes a legal duty is generally a question of law for the court to decide." *Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 502, 694 *A.*2d 1017 (1997); *accord Carvalho v. Toll Bros. & Developers,* 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996); *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994); *Wang v. Allstate Ins. Co.,* 125 *N.J.* 2, 15, 592 *A.*2d 527 (1991); *Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 529, 538 *A.*2d 346 (1988). "Ultimately, the determination of the existence of a duty is a question of fairness and public policy." *Kuzmicz v. Ivy Hill Park Apartments, Inc.,* 147 *N.J.* 510, 515, 688 *A.*2d 1018 (1997); *accord Clohesy, supra,* 149 *N.J.* at 502–03, 694 *A.*2d 1017; *Snyder v. American Ass'n of Blood Banks,* 144 *N.J.* 269, 292, 676 *A.*2d 1036 (1996); *Carvalho, supra,* 143 *N.J.* at 572, 675 *A.*2d 209; *Crawn v. Campo,* 136 *N.J.* 494, 503, 643 *A.*2d 600 (1994); *Dunphy v. Gregor,* 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994); *Carter Lincoln–Mercury, supra,* 135 *N.J.* at 194–95, 638 *A.*2d 1288; *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993); *Wang, supra,* 125 *N.J.* at 15, 592 *A.*2d 527; *Strachan, supra,* 109 *N.J.* at 523, 538 *A.*2d 346; *Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984).

That determination depends, in part, on "the public interest in the proposed solution." *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583, 186 *A.2d* 291 (1962); *accord Steele v. Kerrigan*, 148 *N.J.* 1, 23, 689 *A.2d* 685 (1997); *Del Tufo v. Township of Old Bridge*, 147 *N.J.* 90, 113, 685 *A.2d* 1267 (1996); *Carvalho, supra*, 143 *N.J.* at 573, 675 *A.2d* 209; *Contey v. New Jersey Bell Tel. Co.*, 136 *N.J.* 582, 587, 643 *A.2d* 1005 (1994); *Carter Lincoln–Mercury, supra*, 135 *N.J.* at 194, 638 *A.2d* 1288; *Hopkins, supra*, 132 *N.J.* at 439, 625 *A.2d* 1110; *Kelly, supra*, 96 *N.J.* at 544, 476 *A.2d* 1219; *Portee v. Jaffee*, 84 *N.J.* 88, 101, 417 *A.2d* 521 (1980).

These principles pertaining to duty in tort law have been imported into our strict liability jurisprudence.

> [I]t is the function of the court to decide whether the manufacturer has the duty and obligation imposed by the strict liability principle. As in tort law generally, determination of existence of a duty depends on balancing the nature of the risk, the public interest and the relationship of the parties.... The question is ultimately one of public policy, the answer being dependent upon a consideration of all relevant factors to decide what is fair and just.
>
> [*Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 172, 406 *A.2d* 140 (1979).]

Thus, the court, rather than the jury, has the responsibility to determine whether defendants owed plaintiff a duty in this case.

In my opinion, imposing a duty on defendants to manufacture or sell a fogger with P–22, a subsequently banned substance known to deplete the ozone layer, would be contrary to public policy, unfair, and would disserve the public interest. The Clean Air Act Amendments of 1990 phased out the use of P–22. *Public L. No.* 101–549, §§ 602(a), 605, 104 *Stat.* 2399, 2651, 2658–59 (1990) (codified at 42 *U.S.C.A.* §§ 7671a, 7671d). In so doing, Congress and President Bush concluded that P–22, which is also called hydrochlorofluorocarbon–22 (HCFC–22), should ultimately be banned because it is an ozone depleter. The determination that P–22 is unfit for use in this country is a reflection of this nation's public policy of protecting the environment from ozone depleters. Implementing the Clear Air Act Amendments, the Environmental Protection Agency (EPA) in 1993 prohibited the use of P–22, designated a class II substance by the Clean Air Act, in foggers.

58 *Fed.Reg.* 69672 (1993) (codified at 40 *C.F.R.* § 82.70). By banning nonessential products containing P–22, the EPA accelerated swiftly the prohibition of the ozone depleter. The promulgation of the rule reflected a federal public policy to eliminate rapidly P–22 from nonessential products such as foggers.

Federal law can comprise this State's public policy. *See Mehlman v. Mobil Oil Corp.* 153 *N.J.* 163, 190–91, 707 *A.*2d 1000 (1998) (finding, under Conscientious Employee Protection Act, a clear mandate of public policy based, in part, on federal regulations); *D'Agostino v. Johnson & Johnson, Inc.,* 133 *N.J.* 516, 528, 628 *A.*2d 305 (1993) (holding, under CEPA, "[f]ederal law and policy can constitute New Jersey's clear mandate of public policy"). This State shares the federal government's interest in protecting the environment. Accordingly, this State and the federal government have the common goal of preserving the ozone layer. Consequently, this State's tort law should incorporate the federal government's ozone protection policies, including the prohibition of foggers containing P–22. Our State's tort law should be at least as protective of the ozone layer as federal law. *Cf. Feldman v. Lederle Labs.,* 97 *N.J.* 429, 461, 479 *A.*2d 374 (1984) (holding federal regulations are minimal standards that this State's tort law may exceed).

Although foggers containing P–22 were legal at the time defendants manufactured and sold the Combat Room Fogger that injured plaintiff, as a matter of public policy defendants should not have a duty to design or sell a fogger with P–22. Despite its legality at the time, the basis for the ban existed in 1988 and 1989, when the fogger in this case was manufactured and sold. At that time P–22 was known to deplete the ozone layer, and the chemical's detrimental effect on the environment was sufficiently serious to warrant P–22's current ban from foggers and other pressurized dispensers and aerosols. In fact, in 1987 the international community agreed to limit and reduce the use of P–22 and other ozone-depleting substances. *See* Montreal Protocol on Substances That

Deplete the Ozone Layer, Sept. 16, 1987, 26 *I.L.M.* 1550 (entered into force Jan. 1, 1989).

The available information on P–22's ozone-depleting qualities should be imputed to defendants. In *Feldman, supra,* 97 *N.J.* at 453, 479 *A.*2d 374, this Court held that available scientific knowledge of the deleterious effects of Declomycin, a tetracycline, should be imputed to a drug manufacturer. We wrote that "in some fields ... a manufacturer may be expected to be informed and affirmatively to seek out information concerning the public's use of its own product." *Ibid.* We added: "Furthermore, a reasonably prudent manufacturer will be deemed to know of reliable information generally available or reasonably obtainable in the industry or in the particular field involved." *Ibid.* Our law should be symmetrical. If a manufacturer may be charged with available information, it should also be credited with such information. Thus, in this case, defendants should be credited with being aware of P–22's ozone-depleting qualities, which was widely known in the scientific and manufacturing community and the subject of an international agreement. In view of defendants' knowledge, imputed or actual, that P–22 depleted the ozone layer, defendants should benefit from the subsequent ban of the substance and be shielded from the imposition of a duty to manufacture or sell a fogger comprising P–22.

Due to its well-known ozone-depleting qualities, the inclusion of P–22 in foggers, whether in 1988 or 1998, is contrary to this State's public policy. Consequently, for the same public policy reason, defendants should not have a duty to manufacture or sell foggers with P–22, even when doing so was not proscribed.

Imposing a duty on manufacturers to create a product with a subsequently banned substance would create inimical incentives. Influencing the behavior of persons or entities through incentives is one of the fundamental purposes of tort law. *See Gantes v. Kason Corp.,* 145 *N.J.* 478, 489–90, 679 *A.*2d 106 (1996) (recognizing importance of deterrence goal of torts in strict products liability); W. Page Keeton et al., *Prosser and Keeton on the Law*

*of Torts* (5th ed.1984) § 4, at 25–26 (discussing tort law's goals of preventing future harm and punishing tortfeasors). Putting a duty on defendants in this case fails to discourage sufficiently manufacturers from creating products with ingredients that are fundamentally flawed and prone to proscription. Knowledge of the reasons for the ban exists long before the promulgation of the prohibition. Though creating a product with a banned substance prior to its prohibition obviously is permissible, doing so should be discouraged.

By placing a duty on defendants, the majority encourages the manufacture or sale of products known to be unsafe. That conflicts our well-established strict liability jurisprudence. Accordingly, the Court's holding generates discord and confusion, rather than harmony, in our law. *See Vega v. Piedilato*, 154 *N.J.* 496, 510–11, 713 A.2d 442 (1998) (Handler, J., concurring) (recognizing need to harmonize the law).

Besides, placing a duty on defendants to create or sell foggers with P–22 cannot shape their future behavior. The deterrence goal of tort law is well-grounded in our jurisprudence. *See Gantes, supra,* 145 *N.J.* at 489–90, 679 A.2d 106 (emphasizing this State's strict products liability law's goal to discourage manufacture and distribution of harmful products). Of course, today United Industries cannot begin to put P–22, rather than the purportedly more flammable hydrocarbon propellant, in the Combat Room Fogger because doing so would be illegal. Therefore, imposing a duty on defendants in this case does not advance the deterrence goal of tort law.

In addition, imposing a duty on a manufacturer to design a product that has been prohibited contradicts the expectations the ban engenders. A manufacturer that did not design products with a subsequently banned substance known to be flawed would expect to be applauded for choosing not to use the substance prior to its proscription. By imposing a duty on defendants to have used P–22 in the foggers they created or sold, the court penalizes, rather than praises, defendants for creating or selling a product

that did not deplete the ozone layer. The unanticipated imposition of a duty on defendants is unfair because defendants had no opportunity to conform their behavior in accordance with the unexpected duty.

Lastly, imposing a duty on defendants puts both the manufacturer and seller in a quandary. If defendants had designed or sold foggers with P–22, a known ozone-depleter and a suspected teratogen, they would be subject to liability for the harms P–22 would have caused. By imposing a duty on defendants in this case, the majority is subjecting defendants to potential liability for using an alternative to P–22. Placing defendants in a bind from which they cannot escape the threat of liability is unfair. Instead, defendants should be immune from liability for manufacturing or selling a product that was known to have the undesirable effects that caused its subsequent ban.

The Court is misguided in converting this issue into a factual matter to be determined by a jury. In strict products liability cases, juries are enjoined to determine on the basis of a risk-utility analysis whether a product's lack of safety outweighs its usefulness. *See Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 238 n. 1, 432 *A.*2d 925 (1981) (explaining the risk-utility analysis). Plaintiff's theory of liability in this case requires a comparison of the risks of two distinct product designs. A jury ought not, in this context, be called upon to engage in a risk-risk analysis to determine which risk ultimately must be counterbalanced with the products' utility. In permitting a jury to do so, the Court delegates its own nondelegable responsibility for determining as a matter of law whether a duty may appropriately be placed on a manufacturer.

## II

Defendants should not be dutybound to design or sell a fogger that contained P–22, a substance that has been banned for depleting the ozone layer. At the time the fogger was manufactured or sold, there was information available to the manufacturers suffi-

cient to impute knowledge to defendants that P–22 was an ozone depleter. The imposition of a duty contravenes this State's public policy of preserving the environment, creates detrimental incentives, fails to deter defendants, and unfairly places defendants in an untenable position from which they cannot avoid liability. Imposing a duty in these circumstances disserves the public interest.

Because the majority believes that a jury should determine whether the Combat Room Fogger should have been designed to include P–22, I dissent from that aspect of the Court's judgment.

Chief Justice PORITZ and Justice GARIBALDI join in this opinion.

*For affirmance as modified*—Justices POLLOCK, O'HERN, STEIN, and COLEMAN—4.

*Concur in part; dissent in part*—Chief Justice PORITZ and Justices HANDLER and GARIBALDI—3.