**Debra Lynn HENLEY, et al., Plaintiffs,**

v.

**FMC CORPORATION, a Delaware
Corporation, Defendant.**

Civ.A. No. 2:95–1098.

United States District Court,
S.D. West Virginia,
Charleston Division.

June 23, 1999.

Order Denying Reconsideration
Oct. 14, 1999.

Richard Neely, Neely & Hunter, Charleston, WV, Wilson H. Barnes, Henry Dart, Jack W. Harang, Law Offices of Jack W. Harang, Metairie, LA, for plaintiffs.

Joseph S. Beeson, Michael B. Victorson, Robinson & McElwee, Charleston, WV, Lee Davis Thames, O. Kendall Moore, Butler, Snow, O'Mara, Stevens & Cannada, PLLC, Jackson, MS, for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are Defendant FMC Corporation's (FMC) motion for a new trial; (2) Plaintiffs' "Rule"[1] to strike FMC's notice of

---

**1.** This is an archaic means for requesting a court to settle or decide a point of law. Modern practice requires a motion for such a request. *See* Fed.R.Civ.P. 7(b)(1) ("[a]n application to the court for an order shall be by motion ...."). Accordingly, the Court will refer to the "Rule" as a motion.

newly discovered evidence; and (3) Plaintiffs' motion to strike the two affidavits of Charles Spann. The Court GRANTS the motion for new trial and DENIES Plaintiffs' motions.[2]

## I. INTRODUCTION

On the eve of submitting this complex and lengthy class action to the jury, Plaintiffs offered a previously undisclosed rebuttal witness, Mark Drake, one who was not a subject of discovery. Plaintiffs' counsel commented on the relevance of the testimony in comparing it to a key defense witness as follows:

> [N]ot to allow it in would be *manifest injustice* because [the key defense witness] said that that is *the critical station that he relied on for his accuracy of his—of his model.* That is the one that he put the biggest weight on. *And if that one was inaccurate, then his model was inaccurate. And this man is going to say that it is absolutely—the information is absolutely invalid.* There is nothing—I mean, that's—

Sealed trans. at 12 (emphasis added).

The Court observed likewise, noting the significance of the proffered evidence:

> The potential probative value, and I don't know how far this testimony goes, is *immense. The key to this case is whether the plaintiffs were exposed to a release that hurt them.* The defense has been made out that they were not so exposed *in a very understandable fashion with, you know, a good expert and more than one expert.*
>
> If the information that Mr. Drake has is accurate and as to this one particular reading, and if that is the most important reading or the jury is led to believe that it is, then the nonfunctioning of the measurement instrument on the day of December 5th *could be outcome determinative. Certainly it would destroy the thrust of the defense or heavily impair it.*

Sealed trans. at 19 (emphasis added).

In the Court's assessment, the actual trial testimony from Drake effectively dismantled FMC's defense. Now, the tables have turned once again. New evidence offered by FMC post-trial has laid waste to, not simply impeached or impugned, Drake's trial testimony. To ignore this newly discovered evidence would amount to a miscarriage of justice. Accordingly, the Court exercises its discretion pursuant to *Rule* 59(a).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs instituted this action after chemicals leaked at FMC's Nitro facility on December 11, 1995. Class action discovery was undertaken, and the Court certified the class conditionally on January 22, 1997. Following, *inter alia,* (1) an unsuccessful interlocutory appeal to the Court of Appeals, (2) the parties' submission of their respective plans for the notice and claims process; and (3) the entry of a detailed Case Management and Scheduling Order, the Court undertook to notify the tens of thousands of potential class members and provide them an opportunity to opt out or file claims. The parties also engaged in substantial formal and informal discovery. Following discovery and the notice and claims process, the Court resolved the parties' dispositive motions, and the case went to trial.

Jury selection commenced September 22, 1998. Both sides presented a mountain of complex and hotly contested testimony and documentary evidence. The most contested issue at trial was whether Plaintiffs were at any time exposed to concentrations of chemical agents sufficient to harm them. To be exposed, Plaintiffs had to be in the downwind drift from the leak. Plaintiffs relied principally on their own lay testimony of effects they suffered; FMC relied principally on expert testimony to the contrary, based on wind and environmental factors.

The man at the very center of FMC's theory of the case was Dr. Tony Eggleston. Dr. Eggleston is a meteorologist and air modeler. He was touted by FMC as having

---

**2.** This Opinion contains previously sealed arguments and testimony. Anything previously under seal and not appearing in this Opinion, however, remains under seal.

identified the path and location of the plume for the relevant time periods following the leak. His central role was evidenced by the fact that at least one other FMC witness conceded that if Dr. Eggleston's conclusions were wrong, he too would be in error.

Dr. Eggleston relied heavily on data gathered from a weather and wind monitoring station in the Nitro area very close to the site of the leak. This information was secured from Charles Spann, Assistant Chief of Air Monitoring in the Office of Air Quality (OAQ) for the West Virginia Department of Environmental Protection (DEP).

The defense rested its case on October 2. Practically, FMC's entire defense rested on the foundation laid by Dr. Eggleston. It was at this point the most significant response occurred.

Plaintiffs disclosed they had one rebuttal witness and called Mark Drake, an OAQ service technician and an employee of Spann. Thames objected immediately, noting Drake was not a subject of discovery and did not appear on Plaintiffs' witness list.[3] Plaintiffs' counsel, Jack W. Harang, represented Drake was not discovered until the previous day, October 1, and the information Drake had in his possession was not available until then.

Drake was offered to testify that the wind direction information from the Nitro tower relied upon by Dr. Eggleston was unreliable because the wind vane was broken on that day. The significance of such testimony was readily apparent to the lawyers and the Court. If the vane was broken, or Drake's testimony otherwise impaired Dr. Eggleston's testimony in any substantial way, Eggleston's excruciatingly detailed analyses, perhaps those of other defense experts and, indeed, the very core of FMC's defense would largely destruct.

The Court's first questions to Mr. Harang were whether Drake was authorized by DEP to testify:

THE COURT: Has he been authorized to testify by his superior?

MR. HARANG: Yes, Your Honor. These are a copy of the official records.

THE COURT: Is he the person to give the testimony and has he been authorized to testify and has the West Virginia Department of EPA been given notice that you intend to call this man as a witness?

MR. HARANG: Yes, I'm sure.

Sealed trans. at 3–4.

Plaintiffs represented many things to the Court during the original proffer of Drake as a witness. First, one of Plaintiffs' lawyers, Richard Neely, asserted his paralegal, Michele Drake,[4] first spoke with Mr. Drake on October 1 at DEP only to verify data for Neely's cross examination of Dr. Eggleston. Drake putatively informed the paralegal later " 'Oh, it doesn't make any difference. The machine was broken and the results weren't any good at all.' " Sealed trans. at 5.

Second, as alluded above, the Court inquired very specifically about whether Mr. Drake was authorized by the appropriate officials at DEP to testify to anything:

THE COURT: Okay. Well, I will say again back to my original premise, is this man authorized to come in here and testify on behalf of the West Virginia DEP and to bind it?

MR. NEELY: Yes, he fixed the machine.

. . . .

THE COURT: That is not the question.

MR. NEELY: Well, he was subpoenaed as the person—when we called DEP, said—again, this is what I understand from Ms. Drake.

THE COURT: Until I straighten it out, I'm not going to have that testimony.

. . . .

MR. DART: Joel Maddier (phonetic), his supervisor, and Skip [Cropp], the attor-

---

**3.** Counsel for the Plaintiffs, Henry Dart, noted Spann was on Plaintiffs' witness list. Mr. Thames, however, posed no objection to Spann testifying because "Dr. Eggleston . . . spoke with . . . Mr. Spann and . . . he checked with him and was told [his information] was good." Trans. at 1815.

**4.** The Court investigated any possible familial relationship between the paralegal and Mr. Drake. After hearing brief testimony, the Court determined the common last names were merely coincidental.

ney for DEP, both authorized the witness to be here today.

Sealed trans. at 7, 9–10.

Third, it was represented that Mr. Drake "made the official records" and "entered the data" on the records in question. Sealed trans. at 8.

When Drake was first called, FMC noted the surprise nature of the witness. Thames asserted Plaintiffs had ample time during discovery to investigate the facts, such as the critical DEP data underlying Dr. Eggleston's opinions. FMC was also disturbed understandably by the timing of the disclosure of the potential problem, remarking "And they let us—let Dr. Eggleston leave town this afternoon, having found or discovered this last night or had the indication of it . . . ." Sealed trans. at 11. The Court was concerned as well, stating

> There is no notice. Such notice as might have been available could have been imparted by the plaintiffs last evening and was not, for whatever reason, good, bad, indifferent, or perhaps you didn't even think about it. It could have been, but in any event, it was not imparted.

Sealed trans. at 20.

The Court adjourned the proceedings on Friday afternoon to permit FMC time to contact Dr. Eggleston and to do further discovery of the circumstances surrounding Drake's testimony and the three documents in his possession.

The trial reconvened on Monday, October 5. Thames attacked the circumstances of Drake's appearance, noting: (1) Plaintiffs' paralegal spoke with Drake for the first time on Wednesday, September 30 around noon, and a subpoena was issued on that date; (2) the relevant records were faxed to Plaintiffs lawyers' offices on October 1, 1999; (3) Plaintiffs told Drake to appear at Court on Friday, not Thursday; (4) DEP lawyers authorized Drake only to present the three documents and authenticate them;[5] and, most importantly; (5) Charles Spann, not Drake, was the author of the most hotly contested of the three documents.[6] As aptly, and presciently, put by Thames, "[Mr. Spann] knows what happened on the 27th of November '95, if anything did. Mr. Drake does not." Trans. at 1771.

Further objections to the anticipated testimony were also made. The interjection of Spann into the mix further complicated the thorny issue of admissibility, as Spann was then traveling the remote silk trade routes to China and unavailable to anyone connected with the case.

Rather than again trying to sift the conflicting representations of counsel, the Court directed Drake to take the stand outside the jury's presence. His testimony summary follows.

Drake first noted one of his duties was to maintain and calibrate weather towers in Nitro, Institute, Belle and North Charleston. The towers provide wind direction, speed and other information. Both Drake and his superior, Spann, shared responsibility for monitoring the towers. If something needed to be replaced on one of them, both Spann and Drake did it together.

There are wind direction vanes atop the towers. Apparently, the vanes are flimsy and can be damaged merely by a bird perching on them. When this occurs, the vane has to be replaced by Spann and Drake in tandem. Usually, defective vanes are not replaced the same day they are discovered; they are left in position until a new vane can be obtained.

Drake then reviewed a document of November 27, 1995, which was in Spann's handwriting. Drake admitted he had "no knowledge at all about the information on" the November 27 checklist because Spann pre-

---

**5.** Plaintiffs' counsel responded, however, "Mr. Drake talked to the attorneys, . . . [and] he was to come here and testify about these documents, not just to drop three documents off to the Court." Trans. at 1777.

**6.** The Court is disturbed greatly by the misrepresentations, innocent or intentional, Plaintiffs' counsel made concerning Drake's proposed testimony. On an issue of this moment, the Court expects nothing less than candid, complete and accurate statements and proffers from the members of the bar who practice before it. In this crucial exchange, Plaintiff's counsel fell short of the duty to be candid and truthful with the Court.

pared it. Trans. at 1802. He also reviewed a December 6, 1995 document in his own handwriting. The two documents were "Valley Meteorological Towers Checklist[s]" and contain observations about how the towers are performing.

As opposed to writing "OK" in the "observation" box, Spann wrote in a comment on the November 27 checklist that, as far as wind direction was concerned, "0.11 volts for—SSW wind—*looks like 180° off*" (emphasis added). The December 6 checklist has the following entries:

Nitro

| | zero | span/350° | 360° | observation |
|---|---|---|---|---|
| wind speed | .0047 | .3383 | | OK |
| wind direction | -.0001 | .6429 | .6445 | OK |
| temperature | | | | |
| comments: | .5460 = 327.6° Vane is New | | | |

Drake characterized the word next to the "comments:" section above to be both "new" and "NW" (for northwest) on direct and cross examination respectively. The Court prompted him to explain, and he said:

There looks to be like an E in there, but if you look at it, too, it looks like the E could be on the bottom and something written over top of it.

Trans. at 1807.

Further adding to the confusion, Drake did not recollect specifically installing a new vane on December 6. He then stated, however, he would not have recorded the .5460 value, indicating a voltage setting equal to 327°, if he were not putting in a new vane. In Drake's words, "That type of entry tells me that I have done something extra, something beyond normal." Trans. at 1808.

The significance of these two documents was apparent. If the November 27 checklist indicated a broken vane, and the December 6 checklist seemed to indicate a new vane was installed on that date, the Nitro Tower would not have been a reliable source of data at the time of the leak.[7]

The documents were so damning on the critical issue of exposure that the Court harbored serious concerns about the bona fides of the records. The Court asked Drake the

direct question of whether he had recently altered the questioned entry for any reason. When he responded no, the Court adjourned the hearing briefly and had court personnel retrieve the original document from the DEP. At that time, the Court stated the question of what the entry said amounted to a "critical issue." Trans. at 1812.

Before the hearing adjourned, Drake testified concerning the scope of his authority to testify after speaking with Cropp and a "public relations" spokesperson for the DEP:

They said there would be no problem for me to testify, that probably all that would be asked would be are these records—are these the records, are they correct, and that would be it.

Trans. at 1797–98. He also said he was not given specific permission to testify beyond the documents given him. Harang then stated when the hearing was adjourned, however, that "Mr. Neely has also talked to counsel for the [DEP] and Mr. Drake is permitted to testify to any information *for which he has expertise*." Trans. at 1811 (emphasis added).

After court personnel retrieved the original checklist from DEP, the Court allowed Drake to testify:

[T]he evidence in question, of course, *has immense probative value in the case and it is of possible real significance as to the validity of the testimony of some of the witnesses . . . .*

On the other hand, the evidence comes about and comes before this Court and a jury, if the Court allows it in, under highly questionable circumstances. The evidence was known to the plaintiffs on Wednesday, September 30th, and a paralegal agent of the plaintiffs knew what Mr. Drake would testify to if called upon to testify.

He was served with a subpoena on October 1st and was told to appear at 11 o'clock under the subpoena, I believe, but excused until some time on Friday afternoon.

When Dr. Eggleston was cross-examined concerning his conclusions, he was

---

**7.** Harang highlighted this point during his closing argument, stating "But the important part is, ladies and gentlemen, that between November 27th and December 6th, according to the DEQ's documents, you have got to at least question the reliability of any information that came from the blue lines from the Nitro tower." Trans. at 1918.

asked several pointed questions to the effect that if the information you acted upon for your calculations were in anyway erroneous, then your conclusions would go out the window and other references to garbage in, garbage out. And, consequently, I suggest that plaintiffs' counsel quite obviously knew of the information, knew what plaintiffs' counsel intended to do and made no disclosure to the defense. *So the surprise that a defense encounters in a situation like this and the prejudice of not being able to look to the base information at the time it prepares to go to court is something that also is of very great significance.* This is a very difficult balancing function for any trial judge in a situation like this.

I choose to allow the admission of the documents into evidence, and I choose to exclude Mr. Drake's testimony as to the document on 11–27. He can testify to the document on 12–6 on which he made his notations, and he can—and counsel can draw inferences along those lines. But the reference to the 11–27 document would be inappropriate. The document itself goes in because it will satisfy—it will satisfy the rule as a legitimate business record. *I note my concern that Mr. Drake says he is not the keeper of the records,* and he made that clear. *I assume, on the other hand, that the DEP section chief and the counsel for DEP have given him the authority to come down here, whether he has the authority or not, and to speak to those records.* And I assume that if it were necessary to authenticate these records as business records, it could be done.

Trans. at 1816–17 (emphasis added). The Court also advised counsel it would give a cautionary instruction for the jury to consider the circumstances under which the evidence was produced.

Drake then took the stand before the jury, the November 27 and December 6 documents were admitted into evidence, and he testified generally to the following:

1. In characterizing the notation on the December 6 checklist, Drake insisted on direct examination the word "new" was used but on cross was less sure, supposing the letters were actually "NW" for northwest;

2. He wrote down additional information on the December 6 checklist, however, that indicates he installed a new vane on that date;

3. His writing in the "comments" section of the checklist indicates to him that something was wrong with the system and he recalibrated it; and

4. He had no independent recollection of replacing the vane on December 6.

It was this picture the jury was left with as the case moved to closing arguments.

During summations, Harang focused heavily on Drake. Nearly five of the twenty-four pages of Harang's transcribed argument dealt with information garnered from Drake. Given the mountain of evidence adduced on both sides over the two week trial, that again is significant. Dart, in his rebuttal argument, used the Drake testimony and exhibits to savage FMC's non-exposure theory:

Now, you heard the witness this morning from the DEP and you will see the documents that are in evidence that shows unequivocally that the wind direction indicator at the Nitro weather station was reading 180 degrees off. The data on which Dr. Eggleston relies was not reliable and Eggleston told you when he testified that the validity of what comes out of his computer is only as good as what they put in. *And what was put in was absolutely worthless because the weather data from the Nitro weather station was inaccurate.*

Trans. at 1956 (emphasis added).

On October 7, a verdict was rendered in favor of ten of the fourteen class representatives on their individual claims and certain class issues. The following two interrogatories were answered affirmatively:

1. Did any one or more of the Plaintiffs prove by a preponderance of the evidence that Defendant proximately caused them to suffer physical injuries or property damage because of the negligence of the Defendant?

. . . .

2. Did any one or more of the Plaintiffs prove by a preponderance of the evidence that Defendant proximately caused them to suffer physical injuries or property damage because of the doctrine of strict liability?

Interrogatories to the jury at 1. The jury further found "Defendant acted in a wanton or willful or reckless manner or with criminal indifference to civil obligations affecting Plaintiffs' rights[.]" *Id.* at 2. This response necessitated the jury's consideration of an amount of punitive damages the class was entitled to as a result of FMC's conduct.

Following the jury's responses to the interrogatories, and further arguments of counsel, the Court instructed the panel on the applicable considerations for awarding punitive damages. On October 8, the jury awarded the class $38,800,000.00 in punitive damages, which represented five percent of FMC's net worth.

In the weeks following the partial verdicts, the Court and the parties began the process of resolving the causation and damage issues relative to the remaining Plaintiffs and class representatives. In that interim, Spann returned from abroad and, shortly thereafter, FMC filed a "Notice of Newly Discovered Evidence."

The Notice had attached to it an affidavit from Spann containing the following information:

1. He and Drake inspect the towers by doing an "electronic" and a "reality" check. Specifically, they check voltage and calibration as well as visually inspecting the vane and other tower components;

2. The OAQ also employs Kenneth Cain, a contractor from Tennessee, to periodically audit the towers;

3. OAQ employee Pat Adkins maintains raw data files received from the towers and any edited files created subsequently;

4. *The wind sensor was positioned properly and the information provided to Dr. Eggleston was accurate;*

5. Spann reviewed the transcript of Drake's testimony and the documents in question;

6. Had the wind been off 180°, it would not have been due to the broken vane, because a broken vane would have had minimal effect on wind direction readings;

7. The only thing that could have caused a 180° error would be an improper alignment of the tower sensor, which could have occurred only in September 1995, when Cain performed his last audit;

8. There is nothing to indicate an improper sensor alignment, however, and Spann concludes he erred in his observation on November 27, something which can occur during a visual observation if the wind is changing directions rapidly at the time of the observation. Based on these and a number of other reasons, there is nothing to indicate the wind readings were ever 180° off;

9. According to Adkins, there was no editing of data to correct for the Nitro direction sensor being misaligned, something which would have occurred in the event of a misalignment and subsequent discovery of the problem;

10. Had Spann observed damage to the vane on November 27 he would have, according to his usual practice, made a notation of such;

11. He has no recollection of replacing the vane during the relevant period;

12. He believes the word used by Drake on the December 6 checklist is "NW" for northwest rather than "new."

First Aff. of Charles W. Spann. Spann further commented as follows:

I have discussed this matter with Mark Drake and believe that Mr. Drake was placed in a difficult position by being asked to testify at trial without having all of the information necessary to do so. If the plaintiffs' attorney in the *Henley* case had come to me prior to my departure for China and requested information with regard to this subject, I would have reviewed

the Meteorological Tower Records and performed the same careful investigation of the facts that I have now done and would have provided the same information that is contained in this affidavit.

*Id.* at ¶ 18. Based on the contents of the Notice, the parties were allotted time for discovery, and FMC moved for relief from the judgment.

Spann was deposed on March 2, 1999. His deposition tracks closely his affidavit. To highlight, Spann stated:

1.  He would have to speculate as to why he scratched out the words "OK" on the November 27 checklist and made his "looks like 180° off" notation;

2.  If he had to guess about the reason, he would think it was due to either (1) very active winds shifts occurring during his observation; or (2) he made a mistake in his reading of what direction the vane was pointing;

3.  He admitted the remote possibility that he could have been right in thinking the vane was off as indicated;

4.  There are several reasons why the 180° comment was "likely a bogus reading[,]" including (1) there is no record of data editing, which would have occurred in the event of such an error; (2) subsequent visits to the tower would have indicated the problem; and (3) the two ESC audits of the tower, one before the November checklist and one after, would have spotted any problems in the electronics. Spann depo. at 92;

5.  He and Cain recalled speaking in 1995 with each other about the possibility the tower was off 180° but it was decided Cain would not travel to Nitro unless, after subsequent verification by OAQ officials, the vane was off as Spann observed initially;

6.  The reason for Drake's "NW" designation on the December 6 checklist was that Spann likely told him, based on the conversation between Spann and Cain, to double check the direction of the vane and indicate his findings on the checklist;

7.  His admittedly speculative reason for the appearance of a partial "E" between "NW" was perhaps Drake correcting himself after thinking the vane was in a northeast rather than a northwest position;

8.  He believed it "unfair [and] inappropriate" for Drake to have to testify because "[i]t's kind of outside the purview of his normal activities." *Id.* at 104.

9.  Drake "didn't really have much of a chance to dig into the history of the event or the time period to really prepare himself very well." *Id.* at 106.

10.  Collectively, no one in Spann's office remembers going out during the relevant period to correct a problem with the wind-direction sensor at the base of the tower;

11.  To get a 180° error in reading the instrument, the sensor would have to be installed backwards; and

12.  Spann was satisfied the affidavits he signed are accurate to the best of his knowledge and abilities.

## III. DISCUSSION

### A. *Motion to Strike the Two Affidavits of Charles Spann*

Plaintiffs' motion to strike is based upon what Plaintiffs term "veracity and hearsay problems." Oppos. to new trial mot. at 2. First, Plaintiffs complain Spann lacks personal knowledge for the statements in his affidavits that rely upon Adkins, Cain and Drake. In sum, Plaintiffs assert "Charles Spann relied on the entire office to provide information about which he had no personal or first hand knowledge." *Id.* at 5.

Regarding veracity, Plaintiffs initially complain Joe Beeson, co-counsel for FMC, drafted the two affidavits for Spann to sign. That complaint is meaningless, given Spann stated unequivocally at his deposition the affidavits were accurate to the best of his ability. Plaintiffs also assert several inaccuracies, "if not false statements[,]" in the Spann affidavits when compared with his deposition testimony.

By example, in paragraph 6 of his affidavit, Spann states he "provided a copy of the attached 'twenty-four hour report,'" to ... [Dr.] Tony Eggleston, at his request. The report is for December 5, 1995. At the time I provided the information to ... [Dr.] Eggleston, I believed it to be accurate. I continue to believe it to be accurate today." Aff. at ¶ 6. In his deposition, Spann simply noted somebody contacted his office. Spann did not disavow his statement in the affidavit. Rather, he merely clarified his belief and the basis for it. He noted Adkins sometimes prepares a cover letter for his signature to the person requesting information, and he felt sure there was probably a copy of such a letter to Eggleston in the file. In fact, he could not locate the letter upon searching for it later. That fact, however, especially on such a minor point, does not justify striking the affidavit.

Also, in paragraph 11 of the affidavit, Spann stated he was "simply mistaken in ... [his] comment [on the November 27 document] that the vane was 180° off." In his deposition, Spann *reaffirmed the possibility he was mistaken,* but Plaintiffs find fault with the fact he also gave at least one additional explanation for the notation. That additional information, however, in no way compromises the truth of Spann's representation in paragraph 11. At most, and consistent with Spann's deposition testimony, he was merely attempting to be as detailed, accurate and helpful as he possibly could be.

In sum, while Spann's deposition was more detailed than his affidavits, and fleshed out a grey area in the documents, there is no real basis for finding substantial inaccuracies, much less, attributing false statements to him.

Regarding the hearsay charge, Plaintiffs challenge paragraphs 12, 14, 16, 17 and 18 of the affidavit. Assuming paragraphs 12 and 14 meet the definition of hearsay in *Rule* 801, *Federal Rules of Evidence,* the problem has been cured adequately. The alleged hearsay problems arise from conversations Spann had with Cain and Adkins. Both Cain and Adkins, however, have now submitted independent affidavits corroborating the trustworthiness of Spann's statements in his affidavit

about his conversations with them. As for paragraphs 16–18, there simply was no hearsay presented. Rather, the paragraphs in question are Spann's observations and opinions based upon his supervisory role and years of experience in the OAQ.

The statement most closely approaching hearsay is Spann's observation he had "discussed this matter with Mark Drake and [I] believe that Mr. Drake was placed in a difficult position by being asked to testify at trial without having all of the information necessary to do so." Spann Aff. at ¶ 18. One labors in vain to locate within this phrase "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). At most, it is simply a lay opinion on the accuracy of Drake's assertions.

Considering all of Plaintiffs' arguments and assertions in support, there is no merit to the motion to strike. Accordingly, the motion is **DENIED.**

### B. *Plaintiffs' Motion to Strike FMC's Notice of Newly Discovered Evidence and to Recall the January 8, 1999 Order*

The basis for this motion is that (1) the Spann evidence is not newly discovered; (2) FMC was inexcusably ignorant and not duly diligent in regard to the Spann evidence; and (3) "there is no procedural vehicle governing the Court's consideration of this evidence, and therefore there is no procedural vehicle for ordinary relief available to the class in case of an adverse ruling by the Court." Mot. at 1–2. The first two contentions are addressed in detail in the context of the new trial discussion *infra.* The final contention clearly lacks merit, as Plaintiffs appear to concede in reply. Pls.' reply-oppos. at 5. Accordingly, the Court **DENIES** Plaintiffs' motion.

### C. *FMC's Motion for New Trial*

*Rule* 59(a), *Federal Rules of Civil Procedure,* provides pertinently as follows:

(a) **Grounds.** A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which

there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ....

Fed.R.Civ.P. 59(a).

■ In this circuit, a new trial generally will be granted if

"(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."

*Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996)).

■ Within these broad categories, a new trial also may be granted on newly discovered evidence. To be awarded a new trial, a party must demonstrate four things: (1) the new evidence, discovered post-trial, existed at the time of trial; (2) the party was excusably ignorant of the new evidence despite due diligence; (3) the new evidence is material and of a nature that it would likely lead to a different result; and (4) the evidence is not merely cumulative or impeaching. 12 James Wm. Moore, *Moore's Federal Practice* § 59.13[2][d][ii] (3rd ed.1999); 11 Charles A. Wright *et al., Federal Practice and Procedure* § 2808 (2d ed.1995); *Boryan v. United States,* 884 F.2d 767, 771 (4th Cir.1989); *Western Reserve Oil and Gas Co., Ltd. v. Key Oil, Inc.,* 626 F.Supp. 948, 951–52 (S.D.W.Va.1986); *see Schultz v. Butcher,* 24 F.3d 626, 631 (4th Cir.1994).

■ The plenary power granted a district court under *Rule* 59(a) does not conflict with or usurp the province of the jury. Rather, it "gives the trial judge ample power to prevent what he considers to be a miscarriage of justice. It is the judge's right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so." Wright *et al., supra* § 2803.

■ Regarding the first factor, the evidence submitted post-trial existed at the time of trial. Quite simply, Spann, Cain and Adkins possessed at that time, or had ready access to, the knowledge and information reflected in their affidavits.

The second factor, FMC's excusable ignorance and due diligence, is contested hotly. From the Court's vantage point, however, the analysis is straightforward. Plaintiffs long before trial had an opportunity, and perhaps in fact knew, the critical role the wind direction data played in Dr. Eggleston's opinions. Rather than availing themselves of the discovery process to analyze and then challenge the data, however, they instead waited until the waning days of a lengthy trial to spring a surprise witness and unexpected evidence upon FMC's lawyers and then only after Dr. Eggleston left town.[8] Given the pressing need to get the case to the jury, FMC was given two days to, *inter alia,* investigate (1) Mark Drake and the substance of his testimony; and (2) review the documents in question and attempt to put them in their appropriate context. No doubt FMC would have had a number of questions for Charles Spann had he not been unavailable in remote China. Accordingly, it would be disingenuous to fault FMC for not discovering others who may have had information to provide further insight into the documents. FMC was excusably ignorant and exercised appropriate diligence upon Spann's return to expose Plaintiffs' calculated, late,

---

**8.** It was particularly abhorrent for Plaintiffs to set up Dr. Eggleston and other witnesses on cross examination and then spring their surprise rebuttal on FMC after Dr. Eggleston had departed. As Plaintiffs' counsel well knows, trial by ambush was abolished in the 1930's:

In 1906, Roscoe Pound complained about the "sporting theory of justice" in a speech entitled "The Causes of Popular Dissatisfaction with the Administration of Justice." Trial by ambush was the rule of the day, with neither side required to turn over information to the other prior to the trial. Thus, the United States Supreme Court adopted the Federal Rules of Civil Procedure ("FRCP") in 1938, concerned that truth and justice were better served when all the facts came before the court and jury. FRCP Rule 26 and the accompanying discovery rules were a dramatic change. The rules required both sides to turn over information to each other in what has been described as "a striking and imaginative departure from tradition."

Lawrence J. Fox *et al., Historical Preface,* 67 Fordham L.Rev. 691, 692 (1998)(quoted authority and footnotes omitted).

surprise and successful effort to crush the cornerstone of its defense.[9]

The next factor is whether the new evidence is material and of a nature that it would likely lead to a different result at a second trial. As the Court and counsel have observed, the centerpiece of the defense was that Plaintiffs were never exposed to a concentration of chemicals sufficient to cause injury. If the jury credited Dr. Eggleston's testimony, and the testimony of any other FMC expert whose opinions relied upon his conclusions, it would have been extraordinarily difficult for it to discard that evidence in light of the near vacuum of expert testimony offered by Plaintiffs on individual causation. The Drake testimony, however, gave the jury the opportunity to easily reject the evidence from the FMC experts adduced on exposure and on other issues as well.

Also, one cannot underestimate the timing of the Drake testimony and documentary evidence. First, as opposed to the thorough but tedious expert testimony incrementally presented over the course of the two-week trial, Drake was the last witness the jury heard and, judging by their expressions, the members were riveted by his not-to-be-misunderstood, matter-of-fact testimony. Second, the very nature of how this issue arose, the bench conference that followed and the necessity of excusing the jury for a substantial period of time to resolve the question of admissibility, may have conditioned the jury to anticipate testimony that would cut the Gordian knot hiding the "real truth." It defies human nature to suggest either (1) the jury did not appreciate the impact of Drake's

testimony and the documents in his possession; or (2) they did not accord it the weight any reasonable jury would have given it, considering the timing, content and other circumstances present. Consequently, the Court concludes the newly discovered evidence is both material and of a nature that could likely lead to a different result at a second trial.

Finally, the Court is cognizant evidence that is merely impeaching in nature will not suffice to support the grant of a new trial. The new evidence here, however, is much more than grist for the mill of impeachment. Impeachment is a tool for (1) casting doubt on the veracity of a witness by means of evidence adduced for such purpose; and/or (2) adducing proof that a witness is unworthy of belief. The new evidence would serve both purposes, assuming Drake would be permitted by his superiors to testify, but it goes further. It not only serves to seriously deprecate Drake's trial testimony and his interpretation of the documents, but also supplants that testimony entirely, replacing it with his supervisor's contrary account of the critical wind direction evidence.

Considering the totality of the circumstances, the jury's findings on key issues likely rest on an erroneous foundation. To allow the verdict to stand under such circumstances would result in a manifest miscarriage of justice, one that the Court yet can remedy by corrective action.

Accordingly, the Court **GRANTS** FMC's motion for a new trial and **ORDERS** as follows: [10]

---

9. Further, the Spann evidence was not part of FMC's direct defense but was instead responsive only to refute the late testimony offered by Plaintiffs through Drake. *Rule* 59(a) requires a moving lawyer to be duly diligent, not a prophet.

10. While not urged by Plaintiffs, the Court has examined whether it might keep a portion of the verdict intact and undertake only a partial retrial. The Court has made this inquiry *sua sponte* for several reasons. First, Plaintiffs obtained a very desirable result in a lengthy, complex and hard-fought trial. Second, a very attentive jury labored diligently to a conclusion. It would thus be inappropriate to annul lightly the entirety of their efforts. Finally, judicial economy counsels the Court to at least attempt to limit the time a second jury and this Court would have to expend

on a second trial. Unfortunately for Plaintiffs, the applicable test raises the bar very high.

To justify only a partial new trial, the Court would have to find that "it *clearly appears* ... the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)(emphasis added); *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir.1996); *Schuerholz v. Roach*, 58 F.2d 32, 33–34 (4th Cir.1932).

There is simply no reasoned basis for finding a clear appearance that the issues in this complex case, from liability through damages, were not intertwined to the point, *inter alia*, that FMC would suffer an injustice impacting its Seventh

1. A Final Settlement Conference will be held at 11:00 a.m. on Monday, November 8, 1999 in Charleston; and

2. Trial will commence at 9:30 a.m. on Tuesday, November 9, 1999 in Charleston.

The Court's prior rulings remain the law of the case and, absent good cause shown, the retrial will occur pursuant to the original pretrial order, as amended on the appropriate showing under *Rule* 16, *Federal Rules of Civil Procedure,* and the parties' previously submitted proposed jury instructions.

## IV. CONCLUSION

In closing, the Court stresses to counsel that FMC's motion was granted with the greatest reluctance. This is a matter of great complexity, well tried the first time, and the retrial will be very expensive and occupy much in the way of counsels' and the Court's precious time. In short, all concerned must now painstakingly paint anew an intricate, just-dried canvas. As long recognized by our Court of Appeals, however, a trial judge has not just the "power" but also the "duty" to grant a new trial where the circumstances warrant it. *Cf. Virginian Ry. Co. v. Armentrout,* 166 F.2d 400, 408 (4th Cir.1948).

Amendment rights if a partial retrial were to occur. In any event, courts have observed partial retrials in cases such as these are rarely appropriate. *See, e.g., Lewis v. American Cyanamid Co.,* 155 N.J. 544, 715 A.2d 967, 976 (1998)(stating "Typically, 'issues of negligence and causation are so interrelated that both issues must be retried.' ")(quoting *Ahn v. Kim,* 145 N.J. 423, 678 A.2d 1073 (1996)). The Court agrees with the reasoning underlying *Lewis* and other cases stating the proposition. Indeed, negligence, damages and proximate cause were all, or in part, merged together in the interrogatories answered by the jury. Accordingly, a partial new trial is inappropriate.

1. The Court does not restate here the facts and law contained in the prior Opinion. The prior Opinion sufficiently lays the groundwork for this comparatively brief ruling.

2. The third request is inappropriate on its face. In essence, it amounts to substituting a Court-appointed official to make, or worse assume, class-wide and individual causation findings not made initially on a valid evidentiary basis by the

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.

## MEMORANDUM OPINION AND ORDER

Pending are (1) Plaintiffs' motion to reconsider and amend the June 23 Memorandum Opinion (prior Opinion); and (2) Defendant's notice of conflict with the current trial date, which the Court treats as a motion to continue. The Court **DENIES** both motions.[1]

## I. DISCUSSION

### A. Motion to Reconsider

In sum, Plaintiffs urge the Court to (1) reinstate jury interrogatories 1, 2 and 4 "which involved liability issues, issues based on facts separate and distinct from exposure[,]" memo. in supp. at 2; (2) reinstate the jury's determination of punitive damages; and (3) appoint a special master to hear all the evidence on the "plume" and individual causation and prepare an appropriate recommendation to the Court for final disposition.[2]

None of Plaintiffs' arguments are meritorious. The most facially compelling assertion is that the jury's findings relating to Plaintiffs Tim Harr and Steve Perry should stand because the two were "at the point the 'plume' was created, ground zero[.]" *Id.* at 3

jury. Aside from other difficulties, the proposal presents serious Seventh Amendment obstacles as well. Reinstatement of the punitive damages award would also be inappropriate on a number of grounds, especially given the Court's disposition *infra*.

The Court also notes the instant motion is procedurally improper. Plaintiffs were permitted during the briefing preceding the issuance of the prior Opinion to offer at least six filings on the issues surrounding FMC's new trial motion. The Court's purpose in permitting the unusual briefing was to assure it would have a complete picture of the parties' positions prior to ruling. None of Plaintiffs' filings, however, contain the arguments now asserted. Judicial economy and fairness dictate litigants should press all of their arguments at one time, rather than making assertions piecemeal in a "moving target" presentation to the Court. The orderly staging of cases, especially complex cases, is hindered greatly by parsing out contentions through multiple briefings. Nonetheless, the Court will exercise its discretion to consider Plaintiffs' late substantive assertions where necessary.

(emphasis omitted). Plaintiffs assert the exposure claims of Harr and Perry thus are not affected by Dr. Tony Eggleston's plume-movement testimony, effectively dismantled by the erroneous and prejudicial testimony from Mark Drake. Plaintiffs assert "Harr's ... [and] Perry's statements ... along with [Sherry] Robinson's corroborating statement, were sufficient to show" "generic causation" as to Harr and Perry.[3] *Id.* at 3. The assertions relating to Harr and Perry fail for a number of reasons, but examination of a few of the flaws sufficiently makes the point.

First, Plaintiffs cannot take Harr and Perry out of the causation equation by simply asserting the two were at "ground zero." Memo. in supp. at 3. From an evidentiary standpoint, the assertion necessarily assumes Dr. Eggleston's testimony and opinions did not affect the jury's determination of, *inter alia*, whether the two Plaintiffs were exposed. Dr. Eggleston addressed that precise question, however, in the negative:

> Q. Dr. Eggleston, based on your experience, knowledge, education, and training in the area of dispersion modeling, do you have an opinion to a reasonable degree of scientific certainty as to whether or not *any* of the named plaintiffs that you have identified on that list and that are plaintiffs in case fall within, according to their location, fall within the area of the plume as your dispersion modeling indicated?
>
> A. *No, they do not.*

Trans. at 1634 (emphasis added).[4] This quotation emphasizes Dr. Eggleston's testimony touched Harr and Drake, and indeed all of the Plaintiffs, in a substantial way. The jury, however, most likely discarded Dr. Eggleston's cornerstone opinion on this issue in light of the erroneous Drake testimony. Accepting Plaintiffs' argument now would amount to a finding as a matter of law for Harr and Perry on the vigorously disputed issue of causation. Such a finding would be plainly improper because of the problems with Drake's testimony.

Second, from a general perspective, the assertion fails to account for the Court's concerns, expressed at length in its prior Opinion, of how greatly the erroneous Drake testimony impacted FMC's entire defense.[5] FMC puts the point cogently in its response:

---

3. Plaintiffs assert wrongly "the facts that supported the jury's findings of liability including generic causation *are separate and distinct from the facts surrounding the movement of the 'plume' and each plaintiff's exposure thereto.*" Memo. in supp. at 2–3 (emphasis in original). The Court addresses much of this severability argument in the text. A more detailed discussion of generic causation is warranted here.

Generic causation is mentioned throughout Plaintiffs' briefing. It is present when (1) the combination of the chemical contaminants; *and (2) the Plaintiffs' exposure to them* had the capacity to cause the harm alleged. *See, e.g., Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1200 (6th Cir.1988). At some level then, actual exposure and dose are relevant to the generic-causation inquiry. *See, e.g., James A. Henderson, Jr. et al., Optimal Issue Separation in Modern Products Liability Litigation,* 73 Tex. L.Rev. 1653, 1685 (1995)(stating "the generic causation issue is comprehensible *only if the trier of fact can assume a certain level of exposure to the dangerous product,* and that assumed exposure level must be consistent among all, or most, of the plaintiffs")(emphasis added); Charles W. Schwartz *et al., Class Certification for Environmental and Toxic Tort Claims,* SC64 ALI–ABA 1–SC64 ALI–ABA 1, *22 (1998)(stating "generic causation is meaningful and useful *only if the trier of fact can assume a certain level of exposure to the hazardous substance,* and can then assume that the level of exposure is consistent among all, or substantially all, of the proposed class members")(emphasis added).

While Plaintiffs recognize the second prong of the generic-causation definition, memo. in supp. at 8, their ensuing argument largely ignores it. In sum, Dr. Eggleston's testimony on, *inter alia,* the issues of classwide exposure and plume movement were of paramount importance to FMC's case. That testimony, however, was unfairly overcome and must now be considered anew before a second jury. Plaintiffs simply cannot siphon off an isolated finding of generic causation from the intermixing of issues that occurred at trial.

4. Plaintiffs suggest the "plume" merely "has to do with determining the ambit of the class." Memo. in supp. at 3. To the contrary, the location, concentration and movement of the plume are central to a valid finding of causation and, to a lesser degree, foreseeability as to class members individually and collectively.

5. Plaintiffs offer a news article quoting one of the jurors on the case. The article states:

> [H]er memory of Drake's testimony was sketchy and ... she couldn't recall how big a role his testimony about the weather equipment played during deliberations.
>
> "I don't recall him as being that important to the case, ... I don't know how much that guy influenced the other witnesses."

[I]t cannot be said with any confidence that a jury untainted by the Drake ploy— which falsely created the impression that FMC's attorneys were slipshod or deceptive (and that FMC's entire case was built on a faulty foundation)—would, in any event, have found against FMC on any question.

. . . .

[T]he prejudicial impact—on every portion of the case—of having FMC's defense falsely made to look like a sham, and defense counsel made out to have been slipshod, if not worse, cannot be overstated. As the Court observed, "Drake was the last witness the jury heard and, judging by their expressions, the members were riveted by his not-to-be misunderstood, matter-of-fact testimony." Drake's trial testimony "effectively dismantled FMC's defense."

Resp. memo at 2, 9. Once the jury was led to believe defense counsel and their much-touted exposure expert blundered, or worse yet was downright dishonest, on such a basic data collection task, it probably viewed the remainder of FMC's case challenging causation and all other elements of liability and damages with suspicion. Divining a constitutionally acceptable finding for Harr and Perry or any other Plaintiff in light of such a substantial evidentiary taint is impossible.

Finally, Plaintiffs' motion effectively invites the Court to dissect bits and pieces from the jury's check-marked answers to three one-sentence questions to salvage part of the verdict. That task is likewise impossible. As the Court noted in its prior Opinion,

> There is simply no reasoned basis for finding a clear appearance [as required by Supreme Court and Fourth Circuit precedent] that the issues in this complex case, from liability through damages, were not .intertwined to the point, *inter alia,* that FMC would suffer an injustice impacting its Seventh Amendment rights if a partial retrial were to occur. . . . *Indeed, negligence, damages and proximate cause were all, or in part, merged together in the interrogatories answered by the jury.*

*Henley v. FMC Corp.,* 189 F.R.D. 340, 350–51 n.10 (S.D.W.Va.1999)(emphasis added).[6] The jury's brief responses on the verdict form speak for themselves. Unfortunately, however, the responses say little with respect to how the jury found on very specific issues. That reality alone decimates Plaintiffs' proposed dissection in light of the *Gasoline Products* standard.

Pls.' reply, ex. A. The juror's speculation and difficulty in recollection is understandable, as it appears she was interviewed nearly nine months after her participation on the panel. In any event, the understandably foggy, hearsay recollection of one juror on a panel of many is of little use to Plaintiffs or the Court in this instance.

**6.** Plaintiffs also fault the Court's citation in its prior Opinion to *Lewis v. American Cyanamid Co.,* 155 N.J. 544, 715 A.2d 967 (1998) and *Ahn v. Kim,* 145 N.J. 423, 678 A.2d 1073 (1996). These cases state the unremarkable proposition that issues of negligence and causation are often so interrelated that both must be retried instead of a partial new trial occurring as to either. There are many other authorities recognizing the conceptual overlap:

Perhaps no area of law plagues the logical powers of law students and lawyers more than proximate cause in negligence cases. One of proximate cause's most perplexing points is its overlap with or relationship to the duty element of negligence, supposedly a separate element.

Thomas C. Galligan, Jr., *The Tragedy in Torts,* 5 Cornell J.L. & Pub. Pol'y 139, 160 (1996); *see*

also Peter Schuck, *Municipal Liability Under Section 1983: Some Lessons from Tort Law and Organization Theory,* 77 Geo. L.J. 1753 n. 25 (1989). The overlap is present to a greater degree in this case given the relevant language in the verdict form.

Contrary to Plaintiffs' additional assertions, the principle repeated in *Lewis* and *Ahn* applies equally in the context of a class action or individual-case setting. There is no basis for a distinction. The propriety of a partial new trial here does not hinge on, as Plaintiffs seem to suggest, whether there are common issues present. Rather, in ordering a partial new trial the Court must find it *clearly apparent* "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)(emphasis added); *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 599 (4th Cir.1996); *Schuerholz v. Roach,* 58 F.2d 32, 33–34 (4th Cir.1932). As analyzed at length here and in the Court's prior Opinion, a *Champlin* severance would be practically impossible in the present case. Indeed, Plaintiffs offer no new basis justifying a departure from that prior analysis.

To summarize, as done at length in the prior Opinion, the erroneous Drake testimony so contaminated the proceedings that the Court cannot feel confident in sustaining any jury finding from the first trial, much less when it would involve the separation of very general and interlocking findings.

The Court emphasizes again its extreme reluctance to set aside the prior verdict and order a new trial. On its own motion, the Court has examined alternatives to voiding the jury findings and considered new substantive arguments by Plaintiffs which could have been ignored for procedural reasons noted *supra*. *See Henley v. FMC Corp.*, 189 F.R.D. 340, 350 n. 10 (S.D.W.Va.1999); *see also supra* note 2. Nonetheless, the necessity of a new trial is clear. Accordingly, the Court **DENIES** Plaintiffs' motion for reconsideration.

### B. Defendant's Motion to Continue

In its prior Opinion, the Court scheduled the retrial of this action for November 8, 1999. It did so in an effort to balance the parties' need for sufficient time to prepare and the public's and the Court's interest in achieving a speedy and just resolution of the dispute. On September 15, nearly three months later, FMC's counsel has advised the Court of a trial conflict.

Further delay in the final resolution of this case is neither in the public interest nor warranted under the circumstances presented by defense counsel. Accordingly, the motion to continue is **DENIED.**[7]

The Court further **ORDERS** a status conference scheduled for October 28, 1999 at 1:00 p.m. in Charleston.

---

7. The parties raise two other issues in passing. First, Plaintiffs submitted a brief letter to the Court asserting the Supreme Court of Appeals' recent decision in *Bower v. Westinghouse Electric Corp.*, —— W.Va. ——, 522 S.E.2d 424 (1999), requires reconsideration of certain pretrial rulings. The vehicle for this request is a motion to reconsider filed immediately. Should Plaintiffs choose to file such a motion, they should fully argue and set forth specifically which pretrial rulings by the Court are affected and subject to

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.

modification and the effect modification would have on the issues in the case, from class certification forward. This issue is of critical importance to a determination of the scope of the second trial.

Second, FMC states it may present at least one additional witness. If so, it should present its request to the Court by motion, as contemplated in the prior Opinion, no later than October 20, 1999.